[Crim. No. 5901. In Bank. Nov. 23, 1956.]

THE PEOPLE, Respondent, v. BURTON W. ABBOTT, Appellant.

Leo A. Sullivan for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond M. Momboisse, Deputy Attorney General, J. F. Coakley, District Attorney (Alameda), Dale Stoops and John C. Baldwin, Deputy District Attorneys, for Respondent.

GIBSON, C. J.—Burton W. Abbott was charged by the grand jury of Alameda County with the kidnaping and murder of Stephanie Bryan. Following denial of a motion to set aside the indictment, Abbott petitioned this court for a writ of prohibition on the ground that the Superior Court of Alameda County did not have territorial jurisdiction of the offenses charged. We denied the petition, and he pleaded not guilty to each of the counts. The trial jury, after finding that Abbott was guilty of kidnaping in violation of section

209 of the Penal Code* and that the victim had suffered bodily harm, fixed the penalty at death. It also found him guilty of first degree murder and made no recommendation as to punishment. His motion for a new trial was denied, and he was sentenced to death on both counts. This appeal comes before us automatically. (Pen. Code, § 1239, subd. (b).)

Stephanie Bryan, who was a shy, 14-year-old honor student at Willard Junior High School in Berkeley, disappeared on April 28, 1955, while walking home from school. She left school about 3:15 p. m. and met a girl friend with whom she walked south to Ashby Avenue and then east along that street to the point where it is intersected by College Avenue. After stopping at a branch of the public library and two shops in the vicinity of that intersection, the girls continued eastward together on Ashby for several blocks. They parted about 4 p. m., and, when she was last seen by her friend, Stephanie was near the grounds of the Claremont Hotel. From that point she usually followed a road through the hotel grounds, took a pathway that entered the street on which she lived, and then walked a distance of several hundred feet to her home. This part of her route was relatively secluded.

Stephanie was carrying several books, including a French textbook, and a purse which contained a wallet and a pair of glasses. She was wearing, among other garments, a navy blue cardigan sweater over a white slip-on sweater, a blue cotton skirt, several petticoats, nylon panties and a brassiere.

About 4:15 p. m. on the day Stephanie disappeared, several motorists saw a man struggling with a young girl in a car which had stopped suddenly at the side of a road in Contra Costa County, near the Broadway Tunnel, a few miles north of the Claremont Hotel. The girl appeared to be very frightened and was screaming. She was in the back seat of the

---

*Section 209 of the Penal Code reads in part:

"Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps, or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from relatives or friends of such person any money or valuable thing, or any person who kidnaps or carries away any individual to commit robbery, or any person who aids or abets any such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm or shall be punished by imprisonment in the state prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm."

car, and the man, who was leaning over the front seat, was beating her and pulling her down and away from the rear window. She was wearing a navy blue cardigan garment over something white.

On May 2, four days after Stephanie's disappearance, her French textbook was found beside Franklin Canyon Road in Contra Costa County. Except for the fact that its cover was slightly dampened by dew, the book was clean and dry, although it had rained in the area on April 29 and 30.

Nothing further regarding Stephanie's disappearance was learned until July 15, when her purse and wallet were found in Alameda at the home of defendant Abbott. His wife discovered the articles in a cardboard box in the basement, and, upon reading the identification cards which were in the wallet, she went upstairs and excitedly asked her husband and others who were present if Stephanie Bryan was not the name of the girl whose disappearance had been reported in the newspapers. Abbott said that the purse probably belonged to some friend of Mrs. Abbott. A guest suggested that the police be called, and this was done. As a result of a search conducted by the police in Abbott's home on the following day, Stephanie's glasses, brassiere and the rest of her books were found buried in the basement in 8 inches of sand.

When questioned by the police, Abbott said that, on April 28, the day of Stephanie's disappearance, he left his home in Alameda in the morning and drove to a mountain cabin in Trinity County which was owned by his wife's family. He said that he arrived at the cabin sometime after 8:30 on that evening and remained there until May 1.

At the time of these events Abbott was 27 years old and was attending the University of California in Berkeley. He was a regular customer at a doughnut shop which was located less than a block from the school Stephanie attended. This shop was frequented by pupils from that school, and Stephanie occasionally made purchases there. A witness testified that he saw Abbott at the shop on the afternoon in question and that he saw him leave about 3:20 p. m. and enter his car, a 1949 Chevrolet sedan. At 3:30, a car resembling Abbott's and driven by a man who looked like him went through a red light at the intersection of Ashby and College Avenues, traveling about 40 miles an hour, and continued in an easterly direction on Ashby toward the Claremont Hotel. As we have seen, Stephanie walked eastward on Ashby for several blocks and disappeared in the vicinity of the hotel.

Five persons testified that they witnessed the struggle between a man and a young girl on Tunnel Road near the Broadway Tunnel. One of them identified Abbott as the man in the car, another stated that a picture of Abbott published in a newspaper resembled the man, and a third said that the man was about 30 years of age and had a receding hairline like Abbott's. The other two witnesses described the car in which the incident occurred as similar to Abbott's. Tunnel Road leads to the ''Orinda Crossroads,'' and from this point several roads lead to Highway 40 which may be used to reach the area in Trinity County in which the mountain cabin is located.

On July 20, a search party discovered Stephanie's body in a shallow grave about 300 feet from the cabin in Trinity County. Her panties, which had been ''cut or torn'' through the left side and the crotch, were knotted around her neck. The rest of the clothing Stephanie was wearing on the day of her disappearance was on the body, except for her brassiere, which, as we have seen, was found in Abbott's basement. Because of extensive decomposition, it was impossible to determine by a physical examination whether she had been sexually attacked. The body had been buried while in a state of *rigor mortis,* and the victim's arms and hands were raised in front of her face. There were multiple compound fractures of the skull and two holes about two inches in diameter through the skull. The head injuries were the principal cause of Stephanie's death. Particles of soil had become enmeshed in her cardigan sweater, and it could be inferred that the soil was wet when she was buried. It had rained and snowed near the cabin for several days prior to April 30, but there had been very little rain in the area during May, June or July.

Abbott was seen near the cabin on the morning of April 29, and he was at Wildwood Inn, a nearby tavern, from 2 p. m. until midnight of that day. Abbott's brother and sister-in-law joined him at the cabin about 3 a. m. on April 30. They all left at the same time on the afternoon of May 1, Abbott driving alone in his car. Their return route took them over Franklin Canyon Road where Stephanie's French textbook was discovered about 7:30 a. m. the next morning. During this portion of the trip, Abbott's car was behind the one in which his brother and sister-in-law were riding. Abbott arrived home about 8 or 9 o'clock that evening.

On May 2 Abbott returned to the area in Contra Costa County through which he had traveled the day before on his way home from the mountain cabin. The records of an oil company showed that he purchased gasoline at a station located near the place where Stephanie's book had been found earlier that morning. Abbott admitted being in the vicinity between 11 a. m. and 1 p. m., and said he had gone there to purchase used tires. He was unable to name or describe a place where he had stopped to look at tires, and he did not purchase any. The area is about 12 miles north of the campus of the university where Abbott had classes scheduled at 10, 11 and 1 o'clock.

A search of Abbott's car led to the discovery of two hairs which were indistinguishable from Stephanie's and six which were very similar to her hair. Eighteen fibers matching those in four of her garments were also found. There was blood deep in the floor mat in the back of the car, and the absence of blood on the surface indicated that the mat had been washed. The cardboard box in which Stephanie's purse and wallet were found contained old clothes which Abbott usually wore at the mountain cabin. His boots were encrusted with red mud which was the same as a sample of soil taken from Stephanie's grave at a point 9 inches below the surface. Several fragments of bloodstained cleansing tissue which had been carried by a pack rat from the grave site to a nearby nest were of the type used by Abbott.

When first questioned by the police, Abbott described in detail the route he said he had taken from his home in Alameda to the cabin in Trinity County. The route which he described would not have taken him through Sacramento. Abbott's brother told the police that Abbott had told him that he had stopped in Sacramento en route to the cabin. Upon being informed by the police of his brother's statement, Abbott changed his story and said that he had stopped there at the office of the "State Bureau of Land Management" about 4 p. m., gave a description of the office and drew a diagram of it. The next day he said that, although he had gone to Sacramento, he had not been able to find the office.

At the trial, Abbott testified that he was not in Berkeley on April 28, that he started for the cabin from his home about 10:45 a. m. and that, after stopping to say goodbye to his wife at the beauty shop where she was employed, he proceeded to Sacramento, where he made an unsuccessful search for the land office. He said that he then drove north toward Trinity

County and stopped at a restaurant about 3 p. m., where he was served by a waitress who had dusty blonde hair and was 25 or 30 years old. He testified that he also stopped at the Wildwood Inn for a drink about 8:30 p. m. and that he then drove two miles to the mountain cabin, built a fire and went to bed.

Abbott's account of his activities on April 28 was in conflict not only with the evidence connecting him with Stephanie's disappearance and death which is set forth above but with other testimony as well. He was seen at the state controller's office in Oakland at 1:30 p. m. and at the beauty shop where his wife worked about 2:30 p. m. There was no waitress on duty between 2 and 10 p. m. in the restaurant north of Sacramento in which he claimed to have stopped at 3 o'clock, and no waitress who looked like the one described by him had been employed there during April of 1955. The manager of the Wildwood Inn and his wife, both of whom knew Abbott, testified that Abbott was not at the inn on the night of April 28. A man who drove past the cabin shortly after 10 o'clock said that he did not smell any smoke and saw no tire tracks, light or other sign of life there.

The evidence is clearly sufficient to support the judgment. Abbott contends, however, that the judgment should be reversed, claiming that the Superior Court of Alameda County did not have territorial jurisdiction of the offenses of which he was convicted, that the court erred in discharging a juror and substituting an alternate, that error was committed in the admission of evidence, and that the trial judge and the district attorney were guilty of prejudicial misconduct.

■ The jurisdiction of a criminal action for kidnaping is in the county in which the offense was committed or out of which the victim was taken or in which an act was done by the defendant in promoting or aiding in the commission of the offense. (Pen. Code, § 784. For definition of the terms used in § 784 see Pen. Code, § 691.) Stephanie was taken out of Berkeley, which is in Alameda County, and there can be no doubt that the superior court of that county had jurisdiction to try the offense of kidnaping.

■ Section 790 of the Penal Code provides that the jurisdiction of a criminal action for murder is in the county where the fatal injury was inflicted or the party died or his body was found. Stephanie's body was not found in Alameda County, and there is no evidence that either fatal injury or death occurred there. We are of the view, however, that

section 790 was not intended to exclude the application of other statutory provisions relating to territorial jurisdiction in criminal cases. ■ Section 781 of the Penal Code provides, ''When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory.'' Under this section, the county in which preliminary arrangements for the commission of a crime are made is a proper county in which to prosecute the completed offense, although the acts performed there did not constitute an essential element of the crime. (*People* v. *Gerundo,* 112 Cal.App.2d 863, 869 [247 P.2d 398] ; *People* v. *Anderson,* 90 Cal.App.2d 326, 330 [202 P.2d 1044] ; see *People* v. *Buffum,* 40 Cal.2d 709, 717 [256 P.2d 317].)

■ We are satisfied that, where, as here, charges of both kidnaping and murder are involved and arise out of acts occurring in more than one county, section 781 is to be read as complementing section 790 so that the court of the county out of which the victim was taken has jurisdiction of the offense of murder. (*Cf. State* v. *Wilson,* 38 Wn.2d 593 [231 P.2d 288].)

After evidence had been received for about 11 days, the judge called counsel for both sides into chambers and stated that he had some question as to juror Rettig's qualifications, that he had requested the sheriff to investigate the matter and that, according to the sheriff's report, Rettig worked in the same office as Abbott's brother and used a desk 25 feet away from him. The judge then read portions of the report which set forth statements made by Rettig's fellow employees to the effect that Abbott's brother had been pointed out to Rettig and that, before being selected for jury service, Rettig had discussed the case with three employees and had expressed the opinion to one of them that Abbott was being framed.

The judge informed the attorneys that he intended to question Rettig in chambers and that, while counsel could seek to clarify the facts, there should be no cross-examination. Defense counsel protested that the proceeding to disqualify Rettig was not proper, that the examination of the juror should be conducted in open court, and that they reserved ''any objections and any motions of any possible character.''

Rettig was called into chambers and was questioned by

the judge in the presence of counsel. He said that he worked in the same office as Abbott's brother at a desk 25 feet away and that he had never talked to the brother and did not know who he was until he was pointed out in court. Rettig said that he had not discussed the case, with the possible exception of some remark about the chances of being selected as a juror, and that, although he realized that his service might result in some hardship, he felt that he could render an impartial verdict and did not wish to be relieved. Rettig was discharged by the judge in open court in the presence of the jury. The judge stated that he had decided to discharge the juror because of Rettig's proximity to Abbott's brother in the office where they worked and in order to save Rettig from embarrassment or criticism and that, although there was nothing in the record showing that Rettig knew Abbott's brother or had discussed the case with him, there were people in the office who knew both men. Abbott's motion for a mistrial was denied, and the court seated the first of two alternate jurors who had been selected and sworn at the beginning of the trial.

Section 1089 of the Penal Code provides, in part, "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty . . . the court may order him to be discharged and draw the name of an alternate. . . ." (See also Pen. Code, § 1123.) There is no statutory provision regarding the procedure to be followed in applying section 1089, but it seems clear that the taking of sworn testimony under the usual rules of evidence is not necessary where the facts upon which action is taken are uncontroverted. (See *People* v. *Lanigan*, 22 Cal.2d 569, 577-578 [140 P.2d 24, 148 A.L.R. 176] ; *People* v. *Hess*, 107 Cal.App.2d 407, 424-425 [237 P.2d 568] ; *People* v. *Kobey*, 105 Cal.App.2d 548, 559-560 [234 P.2d 251] ; *People* v. *Burns*, 84 Cal.App.2d 18, 28 et seq. [189 P.2d 868].) The discharge of Rettig was based on the admitted fact that he worked in the same office as Abbott's brother, using a desk only 25 feet away.

The trial court did not abuse its discretion in determining that there was good cause for discharging Rettig. That determination, therefore, cannot now be disturbed. (*In re Devlin*, 139 Cal.App.2d 810, 813 [294 P.2d 466] ; *cf. People* v. *Daugherty*, 40 Cal.2d 876, 889-890 [256 P.2d 911] ; *People* v. *Craig*, 196 Cal. 19, 25 [235 P. 721].) More-

over, there is no showing that Abbott was prejudiced. He was not entitled to be tried by a jury composed of any particular individuals. (*People* v. *Howard,* 211 Cal. 322, 324-325 [295 P. 333, 71 A.L.R. 1385].) The juror who was substituted for Rettig was examined fully by both sides on *voir dire,* accepted as a qualified alternate and served as such from the start of the trial until seated as a regular juror. There is no claim that he was unable to render a fair verdict. ■ It was not error to conduct the proceedings in chambers in Abbott's absence. No objection based on this ground was made until after Rettig was discharged in open court, but even if we assume that Abbott is now in a position to raise the point, it is settled that the presence of a defendant is required only where it has a reasonably substantial relation to the fullness of his opportunity to defend against the charge. (*Snyder* v. *Massachusetts,* 291 U.S. 97, 105-108 [54 S.Ct. 330, 78 L.Ed. 674, 90 A.L.R. 575] ; *People* v. *Isby,* 30 Cal.2d 879, 893-894 [186 P.2d 405].) The absence of Abbott during the proceeding in chambers could not have affected his right to a fair trial. The cases upon which he relies are readily distinguishable because they involved the original selection of a jury in such a manner that jurors unacceptable to the defendant either participated in the trial or may have done so. (*Lewis* v. *United States,* 146 U.S. 370 [13 S.Ct. 136, 36 L.Ed. 1011] ; *Hopt* v. *Utah,* 110 U.S. 574 [4 S.Ct. 202, 28 L.Ed. 262].)

It is contended that the court erred in receiving, as admissions by conduct, evidence of Abbott's reactions to accusatory statements made by the police when they interrogated him following his arrest. Some of the evidence was admitted without objection, but a motion to strike all of it was later made and fully argued. The court granted the motion as to some of the evidence and denied it as to the remainder. The stricken matter included some evidence to which no objection had been made, and there is no indication that the partial denial of the motion was based on the absence of objections. ■ The general rule is that, when it is apparent from the face of a question that the evidence sought to be elicited will necessarily be inadmissible, a motion to strike is not available unless there has been preliminary objection. (*People* v. *Scalamiero,* 143 Cal. 343, 345 [76 P. 1098].) It appears, however, that, in ruling on Abbott's motion, the court chose to pass upon the admissibility of all of the evidence, whether objected to or not. Under the circumstances, we shall

treat the question of whether there was error in admitting the evidence as properly before us for review.

The principles to be applied in determining the admissibility of this type of evidence are clearly defined and fully set forth in *People* v. *Simmons,* 28 Cal.2d 699, 711 et seq. [172 P.2d 18]. (See also *People* v. *Davis,* 43 Cal.2d 661, 669-672 [276 P.2d 801].) In general, where a statement accusing a defendant of a crime or tending to connect him with its commission has been made to him, and he has remained silent or has given an equivocal or evasive reply, evidence of the statement and of his conduct is admissible on the theory that the natural reaction of an innocent man would have been to make a denial and that, therefore, his failure to deny may be regarded as giving rise to an inference of acquiescence in the truth of the statement or as indicating a consciousness of guilt. However, where the defendant remains silent under a claim of right to which he is legally entitled, such an inference is not justified and the evidence may not be admitted.

 The statements of the police and Abbott's responses were made after he had told the police that he was refusing to "talk" on the advice of his attorney. Although he answered some questions, none of his replies indicated a consciousness of guilt, and, when he did not answer a question, the record shows that he was acting on the advice of counsel and standing on his right to refuse to reply. Under the circumstances, it was error to admit the evidence. (*People* v. *McGee,* 31 Cal.2d 229, 238-239 [187 P.2d 706]; *People* v. *Simmons,* 28 Cal.2d 699, 711 et seq. [172 P.2d 18].)

 We have concluded, however, that the error does not require a reversal of the judgment. The interrogation by the police consisted largely of a recitation of the facts with respect to finding Stephanie's belongings in the basement of Abbott's home and the discovery of her body near the mountain cabin, together with the assertion that, unless Abbott had been "framed," these facts showed that he was guilty. Abbott told the police that he did not know of anyone who would "frame" him and that he could not explain how Stephanie's belongings and her body came to be where they were found. The questions which Abbott refused to answer covered much the same ground as those he answered. When examined on the witness stand concerning his responses to questions asked by the police, Abbott took good advantage

of the opportunity to explain the circumstances under which he was interrogated and to show that no inferences unfavorable to him could properly be drawn from his conduct during the interrogation. There is abundant evidence of Abbott's guilt, and an examination of the entire record shows that the error did not result in a miscarriage of justice. (See Cal. Const., art. VI, § 4½.)

Finally, Abbott complains of asserted prejudicial misconduct on the part of the judge and the district attorney during the course of the trial. We have carefully examined all of his claims and find no merit in any of them.

The judgment and the order denying a new trial are affirmed.

Shenk, J., Carter, J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.

Appellant's petition for a rehearing was denied December 19, 1956.