153 So.2d 401

**STATE of Louisiana**

v.

**Forrest K. WHITE, Jr.**

No. 46342.

May 3, 1963.

Dissenting Opinion May 28, 1963.

Rehearing Denied June 4, 1963.

A. B. Cavanaugh, William R. Tete, William B. Baggett, Lake Charles, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Frank T. Salter,

Jr., Dist. Atty., Jack C. Watson, Asst. Dist. Atty., for appellee.

FOURNET, Chief Justice.

The defendant, Forrest K. White, Jr., is appealing from his conviction on a charge by bill of information with aggravated battery "in and upon one Johnny Odom, by striking him with a dangerous weapon, to-wit: a hammer, in violation of R.S. 14:34,"[1] and his sentence thereunder to serve 2 years at hard labor in the state penitentiary, relying for the reversal thereof on a number of errors alleged to have been committed during the course of the trial.[2]

The incident on which the charge is predicated occurred on the afternoon of October 25, 1961, in a Cessna 180 plane flying over a remote portion of Calcasieu parish, the plane having been chartered by the defendant, a real estate broker and appraiser owning his own agency in Lake Charles, and piloted by Johnny Odom, a student at McNeese College in this same city, and an employee of the owners of the plane, Louisiana Flyers. Inasmuch as the version of the incident from the standpoint of the pilot and that of the defendant are irreconcilable, we think it necessary to give a short résumé of both in order that we may properly evaluate and dispose of the errors alleged to have been committed, particularly those forming the basis of Bill of Exceptions Nos. 2, 9, and 15.

It is the state's contention that the plane was chartered by the defendant with the intention of killing the pilot and himself in such a manner as to simulate accidental death in a plane crash so that his family might benefit from his personal insurance of $45,000 in view of the double indemnity clauses for such a death in many of his policies; as well as that carried by the plane owners, $25,000 of which was payable without contest, the insurer reserving the right to litigate or settle for any amount above that to the maximum limit of $50,000 a seat.

Odom, testifying as the prosecuting witness, stated that after he and the defendant had been in flight 1 hour and 15 minutes and were circling an area some 5 miles north of Chennault Air Force Base at an altitude of about 800 feet and traveling at near level in a southwesterly direction approximately 140 miles an hour, his "head was slumped forward and I was sort of knocked down in my seat," his first thought, since he knew of no objects that high in the vicinity, being that "a bird had

---

1. R.S. 14:34 provides: "Aggravated battery is a battery committed with a dangerous weapon. Whoever commits an aggravated battery shall be imprisoned, with or without hard labor, for not more than ten years."

2. Defense counsel claim to have reserved 15 bills, of which the first has been abandoned, and also Bill of Exceptions Nos. 10, 11, and 12, the latter because the judge refused to approve them, having no recollection of their timely reservation.

crashed through the windshield and struck him on the head." Raising his head and noting the windshield was intact, he turned to look in the rear seat of the plane where the defendant was seated and "saw Mr. White with the ball peen hammer in his hand and a glove on his hand, and he hit me here." When White drew back to hit him again, he grabbed the hammer between the head and White's hand and struggled with him for its possession until eventually both simultaneously lost control of it and it fell to the floor, from where defendant frantically sought to recover it. Being unsuccessful and with his feet in the rear seat, the defendant lay across the back of the front seat with his right side against the instrument panel and his head in the windshield, in which position Odom hit him hard with his fist in the face and neck until he realized, after three blows, there was insufficient room for him to manage a swing sufficient to inflict much damage on the defendant, and he therefore forced him back into the rear seat, from which position White sought to choke him by putting his hands about his throat and pulling with a force sufficient to break the rim of the pilot seat, placing the witness in a reclining position strapped to his seat. Although during this time there were several near-crashes into trees, he managed to regain altitude and extricate himself by "brute force" and keeping the defendant, who had no seat belt, off balance through his handling of the plane. Unsuccessful in the attempt to choke him, White several times grabbed the right control column and almost nose-dived the plane into crashes, but Odom was not only able to avoid these also, but, in addition, to overpower the defendant on each occasion. When the Chennault runway was immediately ahead and "I guess Mr. White, seeing that he had failed in his attempt to kill himself and I also, gave up and just settled into the rear seat area," until the plane landed and he ran off into the grass, from where he taxied around to the hangar of the Louisiana Flyers.[3]

The defendant, taking the stand in his own behalf, denied there was any financial, family, or other personal reason that would cause him to attempt to commit suicide in the manner contended by the state. He readily gave full information as to his

3. Members of the air police force from the Chennault base testified that after Odom reached the hangar he wouldn't stand still long enough for the air medics to give him attention and would not cooperate with them but "kept walking around and acting more or less in a cocky manner." His doctor stated he treated him for approximately 45 minutes at the hospital later that evening, taking stitches in the two cuts on his head, one in his center forehead at the hairline and the other over his right ear, although he was not in any shock and no further injuries were revealed. The pants and shirt worn by him, which are in evidence, are blood spattered, particularly in the upper portion of the shirt front, but otherwise appear to be in good condition.

assets and liabilities and stated he not only held policies on his life with the New York Life Insurance Company in the amount established by the state ($45,000, some of which were paid up), but others with different companies totalling around $100,000 in all, many of these having been held by him for years while one, for $15,000, with double indemnity clause, had been applied for the month previous to the incident but had not been consummated because of his inability to find time to take the physical examination. He testified his home and furnishings were insured for $50,000 and his business assets for $10,000; that he owned a half interest in a house in Lake Charles appraised at $17,500 and a fourth interest in a duplex in the same city appraised at $12,-000, the latter being occupied by his mother, widow of a former superintendent of education for Calcasieu parish; that the income from his business ran from $18,000 to $23,-000 a year, the turnover in his business account being from $2,500 to $3,500 a month; that his three bank balances together usually averaged from $2,000 to $4,-000, while a homestead savings account had several thousand dollars in it. He stated his wife owned outright, or an interest in, some 6 tracts of land scattered throughout the state totalling approximately 860 acres, from which she realized sizable mineral royalties (at least $27,000 during the previous five years), and also stock in 2 corporations valued at $10,000. His liabilities, in the form of loans and mortgages, were estimated to be approximately $35,000.

The defendant further testified he had chartered the plane in question—as he had done a number of times previously—for the sole and express purpose of giving further consideration to property in various parts of Calcasieu parish he was appraising for the Lake Charles Harbor & Terminal District in connection with a right-of-way it needed for a new channel on Calcasieu river, and also one for a servitude for an electric line Gulf States Utilities Company,. Inc., proposed to erect, and was, in particular, retracing some of the ground covered in planes piloted by Johnny Odom, the prosecuting witness, on two previous trips when he had been accompanied by men from these concerns. He stated that two of the right-of-way representatives of Gulf States had been in his office that morning for a lengthy conference (both, because of their interest in the property he was to survey that afternoon, were invited to accompany him on the flight but declined because of previous appointments), and he had discussed taking another appraiser with whom he was working and who had been with him a few days prior thereto when they viewed some of the property from a boat, but had made no definite appointment, although he did drop by on his way to the field to see if this man wanted to accompany him but he was working outside his office.

He stated he occupied the rear double seat of the four-seated plane with a large geodetic survey map and his binoculars, which were needed in viewing the land, to a large extent marshy and difficult to reach by land, the brief case, of the "attache" or "dispatch" type being placed open on the front seat next to the pilot, and in which was all of the material usually carried with him in connection with his work (including the ball peen hammer, wooden stakes, work tablets, pencils, ruler, etc.). After he had covered all of the properties in which his employees were interested with the exception of some to the north of Chennault Air Force Base, which he desired to view through the windshield as they approached it, and as he was moving over the right front seat, the pilot, who assisted in the move by placing the brief case on the floor in the front, undertook to force homosexual attentions on him by grabbing his privates, a course he continued to relentlessly pursue even after defendant managed to settle himself in the front seat with the case—picked up from the floor—open on his lap, and despite his order that the plane be returned immediately to the hangar. He stated Odom became very excited and increasingly violent as the sexual attack continued, and, when still repulsed, apparently irrational, tilting the plane at a sharp angle in an attempt to force the defendant through the right door which he (the pilot) was opening. During the ensuing struggle Odom grabbed the ball peen hammer by its head from the open case on defendant's lap and struck him in the throat region with the handle. Whereupon the defendant managed to wrest it from Odom, and, realizing the seriousness of Odom's effort to kill him to avoid exposure of this indecent behaviour, he turned to the offensive and struck Odom a couple of times, the blows landing on his head and the hammer, in the struggle that followed, falling to the floor. Odom continued his effort to kill the defendant by regaining possession of the hammer and maneuvering the plane, but was eventually forced to use his hands to pull the plane to a higher altitude to avoid crashing into some trees, making it possible for the defendant to crawl back into the rear seat, where he remained until the plane landed, although Odom continued to look for the hammer and, turning around, to strike him with his fist. When the plane touched the ground, the defendant's only thought being to get away from Odom, he jumped out as soon as possible and headed for the hangar and his car, some 500 yards across a grass strip from the runway, with Odom attempting to overtake him with the plane, (following for something like 175 to 200 yards according to a member of the air police, and

apparently turning back because of a ditch running through the strip).[4]

The first alleged error complained of here is contained in Bill of Exceptions No. 2, which is levelled at the opening statement of the district attorney, during which the court refused to compel him to confine his remarks to an explanation of the nature of the charge and the evidence by which the state expected to establish it, as required by law. See, R.S. 15:333.

A reference to the statement itself, which is attached to this bill, reflects the district attorney was allowed, over repeated and vigorous protests of defense counsel, to go far afield and make many detailed statements that cannot be considered either in the nature of the charge against the accused or evidence by which counsel expected to prove same, including many totally uncalled for and so improper they could have been made for no other purpose than to prejudice the case before the evidence was introduced. It contains numerous personal opinions and inferences of state counsel in his attempt to belittle the defendant, to anticipate his defense, and to ridicule it. For example,

after the district attorney had, for the fourth time—each over defense objection and with leave of the court—asserted October 25, 1961, was "not a normal day in the life" of the defendant, he continued by stating the defendant had "in a very ingenuous (sic) and brilliant and methodical way  *  *  *  determined to carry out a plan that he had, a plan that evidently resulted from a lack of desire to live or loss of will to live," failing in which, after the plane had landed, he "sat down and dropped his head in his hands" because he needed time to think of a reason to explain the incident, and, being *"a very intelligent person,"* concocted as a defense Odom's homosexual attack, asserting: *"We expect to prove that no normal person or no person with any intelligence* would ever believe that a man in an airplane who couldn't fly could possibly sell a defense of self defense that the pilot actually struck him first." His closing remark in the opening statement was: "When we have presented our testimony and our case, *we are satisfied that you will come back with a verdict of*

---

4. According to the doctor who examined him later that evening the defendant suffered a broken rib, abrasions and scratches of his left shoulder and upper back, scratches of the right flank and shoulder, contusions of the right chest under the breast and of the left parietal (upper back) region of the head, a scratch wound and abrasion of the chin, as well as a swelling of the left thumb that had apparently been sprained. To the air police

first reaching him defendant appeared to be in a state of shock, covered with a good bit of blood, blood and mud on his face, and his left shoulder or arm hurt; also, the band of his wrist watch was almost broken in two. There is a 3x3 angular tear at the bottom of his left back pants pocket according to this article of clothing that is among the exhibits.

*guilty as charged."* (The emphasis has been supplied.)

It is made the mandatory duty of the district attorney under Article No. 333 of the Code of Criminal Procedure (now R.S. 15:333) to make an opening statement to the jury "explaining the nature of the charge and the evidence by which he expects to establish the same." The very basic and fundamental object and purpose of such a statement to the jury is, as has been classically explained in cases and authorities on the subject too numerous to require citation, to so enlighten the jury with respect to the charge and the proof by which the state seeks to establish it beyond a reasonable doubt, it will "enable the jury to understand and appreciate the testimony as it falls from the lips of the witnesses," in order that the jury may be assisted in "arriving at the truth." State v. Sharbino, 194 La. 709, 194 So. 756. However, the scope and extent of such a statement must be controlled by the trial judge in the exercise of a wise and sound discretion, and his action in concluding what is and what is not proper is subject to review by this court in order that we may determine whether that discretion has been abused. State v. Ricks, 170 La. 507, 128 So. 293; State v. Nahoum, 172 La. 83, 133 So. 370; State v. Tullos, 190 La. 184, 182 So. 321; State v. Shuff, 198 La. 67, 3 So.2d 278; State v. Barton, 207 La. 820, 22 So.2d

183; State v. Smith, 212 La. 863, 33 So.2d 664; and State v. Poe, 214 La. 606, 38 So. 2d 359, on rehearing.

We think it is clear from a reading of the opening statement, which, together with the objections and remarks of the judge, covers some nine pages in the typed transcript, that many portions of it were improper, irrelevant, and highly prejudicial. In addition to belittling the defendant and telling the jury he had trumped up a defense of homosexual attack on the spur of the moment when his suicide plan to greatly enrich his family failed, the district attorney stated no normal person, and no person of any intelligence, could possibly expect such a defense to be believed, and the defendant was, unquestionably, guilty. Such remarks had nothing whatever to do with the nature of the charge and clearly were not an outline of the evidence by which the state expected to prove it. They could have been made for no other purpose than conveying to the jury the district attorney's personal impressions and opinions that are usually relegated to closing argument when an effort to sway the jury *after* the evidence has been introduced is permitted within a reasonable limit. See, State v. Fletcher, 210 La. 409, 27 So.2d 179. By refusing to restrict this opening statement within the limits set by law, and instructing the jury to disregard the improper remarks, the judge, in effect, placed his stamp of

approval, as well as the power and dignity and force of his office, on them. We feel this was tantamount to the judge telling the jury the district attorney was right in saying the defendant was guilty, and crazy if he thought anyone would believe such a fantastic defense.[5]

The next two bills argued here (Nos. 3 and 4) were reserved when certain exhibits and photographs were offered in evidence, primarily because the prosecuting attorney in his opening statement, although saying he intended to prove the charge by witnesses, documents, and photographs, did not specifically enumerate them or disclose exactly what he intended to prove by these exhibits, a similar objection having been levelled at this portion of the opening statement and made a part of the previous bill. The objection made then, as well as these bills, is clearly without merit. It is well established in this state that the district attorney need not give in minute detail every shred of evidence by which he intends to establish the charge, or name each and every witness he intends to call to the stand. See, State v. Paternostro, 225 La. 369, 73 So.2d 177; State v. Goins, 232 La. 238, 94 So.2d 244; State v. Stahl, 236 La. 362, 107 So.2d 670; State v. Davis, 241 La. 974, 132 So.2d 866, and the authorities therein cited.

The next three bills (Nos. 5, 6, and 7) are equally without merit. These objections were made while Deputy Sheriff Mazilly was on the stand and will be discussed together. Bill of Exceptions No. 5 was reserved to the refusal of the trial judge to grant defendant a mistrial when the district attorney was permitted to exhibit the ball peen hammer to the jury and remark: "Wouldn't take much for it to be a sledge hammer, would it?" The trial judge instructed the jury such a remark was proper since it had been put in the form of a question rather than a statement, and they should so regard it, whereupon defense counsel objected to this (Bill No. 6) as constituting comment on the evidence by the court. Bill of Exceptions No. 7 was reserved when this witness was asked to express an opinion as to whether discolorations on the ball peen hammer were "dried blood," the basis therefor being he had not been qualified as an expert in this field.

It is our opinion the judge erred in failing to instruct the jury to disregard the remark of the district attorney when it was objected to. It was improper, whether phrased as a question or statement. Nevertheless, we do not think this an error of sufficient magnitude to warrant a mistrial. Nor do we think the judge's instruction with respect thereto can be considered as a comment on the evidence; but, if so, then his prompt statement that the jury should disregard it as such, since it was the

5. Cf., State v. Borde, 209 La. 905, 25 So. 2d 736; State v. Fletcher, 210 La. 409,

27 So.2d 179; and Turner v. Commonwealth, Ky., 240 S.W.2d 80.

sole judge of the evidence, was sufficient to protect the rights of the accused. Inasmuch as the judge advises us in his per curiam that the witness never answered the question with respect to the "dried blood" after the objection was made, the defendant could have suffered no prejudicial effect therefrom, and it was immaterial whether the proper foundation had been laid.

We think the most serious error committed stems from the action of the judge in disqualifying and excusing Juror Wolfe from the regular panel during the trial and substituting the alternate, Ayers, in his place.

It appears that on the fifth day of a 6-day trial, after the morning had been spent in taking the testimony of the prosecuting witness, who had been intensively cross-examined, particularly with respect to his homosexual tendencies, and the state had closed its case and the defendant was testifying, the court recessed for the noon hour. During this time Juror John H. Wolf told the deputy sheriff in charge of the

jury "he *thought* he was disqualified," or had a problem he wanted to talk over with the judge. When so advised the judge sent for state and defense counsel and ordered the juror brought to his chambers, defense counsel immediately protesting the action, particularly since it was out of the presence of the defendant, and refused to waive any of his constitutional rights. After the recess and in open court, with the jury present, the trial judge stated he was excusing Juror Wolfe as disqualified and substituting the alternate, John S. Ayers, and refused to permit defense counsel to then interrogate this juror or inquire into the reason for his disqualification, stating his action had been taken "under authority of R.S. 15:362,[6] *as interpreted by this court,*" whereupon counsel moved for a mistrial and reserved Bill of Exceptions No. 8 when it was refused. Our disposition of this bill will also dispose of Bill of Exceptions 14, reserved when defendant's motion in arrest of judgment was also refused, since it has no other basis than the judge's

6. The pertinent portion of R.S. 15:362 reads as follows: "Whenever, in the opinion of a judge of a district court of Louisiana about to try a defendant or defendants against whom has been filed any indictment or bill of information, the trial is likely to be a protracted one, the court may cause an entry to that effect to be made in the minutes of the court, and thereupon, immediately after the jury is impaneled and sworn, the court may direct the selection of one or two additional jurors, in its discretion, to be known as alternate jurors. Alternate jurors shall be drawn from the same source, and in the same manner and have the same qualifications as the jurors already sworn, and be subject to the same examination and challenges. * * * *If before the final submission of the case a juror dies, or becomes ill, or if, in the opinion of the court, there is any other cause which renders him unable or disqualified to perform his duty, or warrants his discharge as a juror, the court may order him to be discharged.*" (The emphasis has been supplied.)

action in disqualifying Juror Wolf out of the defendant's presence. (The emphasis has been supplied.)

■ In his per curiam the judge advises that during the discussion in his chambers Juror Wolf stated something had developed during the trial that caused him to feel there was a conflict of interest that he (the juror) *"thought * * * might affect* his verdict in the case." The judge says *"The juror purposely was not asked to disclose the basis of the alleged conflict of interest,"* but was asked *"if he (the juror) thought* he could decide the case strictly on the evidence and the law and disregard the interest *he considered as a conflict,"* and the juror replied: "It would tax me to do so." Feeling, therefore, it would be improper to permit Wolf to remain on the panel, he advised counsel he would disqualify and excuse this juror as soon as court reconvened. (The emphasis has been supplied.)

The selection and use of alternate jurors is of comparatively recent origin in this state, only coming into being for the first time in 1940 when the legislature, by its Act No. 6, authorized the use of such jurors if a regular juror *died* or became *so ill* before final submission of the case as to be unable to perform his duty. This power was extended by the legislature of 1944 when, in its Act No. 225, it added the provision *"or for any other cause which in the opinion of the court renders him unable or disqualified to perform his duty or warrants his discharge as a juror."* Prior thereto, under Article 360 of the Code of Criminal Procedure as adopted in 1928, once a juror was accepted and sworn, he could only be discharged and another selected in the ordinary course provided by law if it was discovered he was "incompetent to serve" *before the evidence went to the jury.* The provisions of the acts of 1940 and 1944 were, in essence, incorporated as a part of our statutes when they were revised in 1950 as R.S. 15:362. (The emphasis has been supplied.)

■ It would appear to us that under the clear language of the pertinent provisions of R.S. 15:362, reflected by the underscored portion thereof appearing in Footnote No. 6, the judge is without authority to excuse a juror and substitute the alternate unless and until a juror dies, is too ill to serve, or there is a *legal cause* that renders him incompetent to serve.[7] Moreover, we think, as was also contended by defense counsel, that the ex parte hearing in the judge's chambers was a clear violation of the well-settled rule universally obtaining that an accused must be present at each and every stage of the trial from arraignment to sentence. Under this jurisprudence and law it is well established in Louisiana that the absence of the defendant

7. Cf., State v. Willie, 130 La. 454, 58 So. 147.

from the courtroom during the questioning, challenging, and/or selecting of a juror as competent to serve has the effect of vitiating the entire proceedings. State v. Thomas, 128 La. 813, 55 So. 415; State v. Futrell, 159 La. 1093, 106 So. 651; State v. Layton, 180 La. 1029, 158 So. 375; and State v. Peyton, 193 La. 354, 190 So. 579. See, also, 4 Louisiana Law Review 620 and 12 Louisiana Law Review 178, as well as 1 Marr's Criminal Jurisprudence 407, Section 275. This being so, once a juror has been qualified as competent to serve and sworn—all in the presence of the defendant—he cannot thereafter be disqualified as incompetent to serve unless the defendant is present.[8]

The wisdom of this rule would seem to be particularly apt in the instant case inasmuch as it is pointed out in the motion for a new trial (of which this bill also forms a part), that throughout the trial the wife of Alternate Juror Ayers was in the courtroom and seated with the president and part-owner of Louisiana Flyers and his wife, and that all were seated immediately behind the district attorney and were passing notes to him, an action the trial judge stated he would not have permitted had he noticed it.

In view of the irreconcilable conflict between the defendant's version of the incident on which this charge is predicated, and that of the prosecuting witness, it seems to us the trial judge might well have granted the defendant's request (this refusal is the basis for Bill of Exceptions No. 9) that the jury be permitted to return to the field and again view the plane after these parties had testified and thus establish by demonstrable evidence the correctness of defendant's version as opposed to that of the prosecuting witness. We think, too, the judge's use of an illustration of a child and a man in stressing in his general charge the extent of force necessary before a plea of self defense would be applicable was, to say the least, unwise, in view of the fact that the prosecuting witness was a much smaller man than the defendant, for such an illustration might have been misunderstood by some of the members of the jury. (The objection to the use of this illustration forms the basis of Bill of Exceptions No. 13.)

Whether there was merit to the principal ground on which a new trial was sought, i. e., newly discovered evidence as reflected by an affidavit of a man who had been similarly approached homosexually by

8. Cf., Snyder v. Commonwealth of Mass., 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674, where it is pointed out that the right of the defendant to be present extends to every stage of the trial, inclusive of the empanelling of the jury; and, further, that if there is a stage in the trial when the court feels it is necessary for defense counsel to be present to protect the rights of the defendant, then "by the same token" defendant is himself entitled to be present.

the prosecuting witness while returning alone with him to Lake Charles from Texas in a car, and the affidavit of another witness corroborating this fact, need not be discussed here for the obvious reason that this evidence will be available at a new trial. (Refusal of this motion is the basis for the fifteenth bill.)

For the reasons assigned, the conviction and sentence are annulled and set aside and the case is remanded for a new trial in accordance with law.

SANDERS and HAMITER, JJ., concur in the result.

HAWTHORNE, Justice (dissenting).

The majority has reversed the conviction and sentence because of certain alleged errors considered prejudicial to the rights of the accused. I have serious doubt that these were errors, but even if they were, I do not think they were prejudicial to the accused so as to entitle him to a new trial.

Bill of Exception No. 2 dealing with the district attorney's opening statement was found by the majority to have merit. Before discussing the so-called objectionable remarks, I should like to point out that the district attorney at the very beginning of this statement told the jury: "* * * Before we proceed, I would like to point out and ask you to bear in mind that these opening statements are not evidence in the case. You are not to consider them as evidence, as fact; are not to consider them in deliberating and arriving at your verdict. The opening statements are not evidence. They do not prove a thing. * * *"

The first portion of the statement objected to is: "Well, where was the defendant, Forrest White, on October 25 [the date of the offense] ? Gentlemen, I can tell you that October 25 was not a normal day in the life of Forrest K. White." When objection was made, the district attorney continued: * * * I'm outlining for the jury what we expect to prove. We expect to prove that October 25 was not a normal day in the life of Forrest K. White, and take it from there, if the Court permits." In overruling the objection the trial judge said, in effect, that he could not tell at the time the objection was made that the remark was not going to be connected with what the State intended to prove in the case. In his per curiam he tells us that when the objection was urged, he could not tell whether or not the State had evidence to support the statement, and that' no prejudice resulted to the accused because in the court's opinion October 25 certainly was not a normal day in the life of the defendant from the standpoint of both the State and the defense.

One of the other remarks which the majority considers objectionable reads: "* * * We expect to prove that he

made this charge of homosexuality as a defense. We expect to prove that no normal person or no person with any intelligence would ever believe that a man in an airplane who couldn't fly could possibly sell a defense of self defense that the pilot actually struck him first." As I view this remark, it is merely anticipatory of the defense which was expected to be urged by the accused, and in fact was urged (see State v. Woods, 161 La. 863, 866, 109 So. 519), and the remark is nothing more than a statement that the facts adduced by the State would show on the trial that such a defense was unrealistic and unbelievable.

The per curiam of the trial judge says that the opening statement of the district attorney, considered in its entirety, was not in his opinion prejudicial to the defendant. With this I agree. It is settled in the jurisprudence of this court that a trial judge in his discretion has control of the scope and extent of the opening statement, and that a conviction will not be reversed for error therein unless the rights of the defendant are plainly violated. State v. Poe, 214 La. 606, 38 So.2d 359; State v. Clark, 231 La. 807, 93 So.2d 13. This court has held on numerous occasions that even in the argument before the jury at the close of the trial, it is only in extreme cases that a verdict will be set aside on account of improper remarks made by the prosecuting officer. 2 Marr's Criminal Jurisprudence of Louisiana (2d ed.1923), sec. 668, p. 1024, and cases cited thereunder.

Bills of Exception Nos. 8 and 14 are, in my opinion, also without merit. I do not think the accused was denied a fair trial or prejudiced in any way because the trial judge determined in chambers that the juror Wolf was disqualified, thereafter discharging him in open court and substituting the alternate juror Ayres in his place.[1] Under the law of this state an accused does not have the right to select a particular juror but has only the right to reject an obnoxious juror. The alternate juror Ayres was accepted by the defense after voir dire examination and served as such from the start of the trial until seated as a regular juror, and no question was raised as to his qualifications. How, then, was the accused prejudiced?

A decision by the Supreme Court of California, People v. Abbott, 47 Cal.2d 362, 303 P.2d 730, is directly in point and is well reasoned. In that case after evidence had been adduced for some 11 days, the trial judge, becoming concerned as to the qualifications of one of the regular jurors, requested an investigation by the sheriff. After receiving the sheriff's re-

1. Where a juror states his doubt as to his ability to perform his duty justly, good cause for dismissal exists. People v. Taylor, 11 Cal.Rptr. 480, 189 Cal.App.2d 490 (1961).

port the judge called counsel for both the defense and the prosecution into his chambers and discussed the juror's qualifications on the basis of the sheriff's report. He then sent for the juror and questioned him there in chambers, stating that there would be no cross-examination by counsel. Defense counsel protested, contending that the proceeding to disqualify the juror was not proper and that the examination of this juror should be conducted in open court. The judge, having concluded to discharge the juror, did so in open court in the presence of the jury and seated an alternate juror who had been selected and sworn at the beginning of the trial.[2] In concluding that defendant's motion for a mistrial under these circumstances had been properly overruled the Supreme Court of California said:

"The trial court did not abuse its discretion in determining that there was good cause for discharging Rettig [the juror]. That determination, therefore, cannot now be disturbed. In re Devlin, 139 Cal.App. 2d 810, 813, 294 P.2d 466; cf. People v. Daugherty, 40 Cal.2d 876, 889–890, 256 P. 2d 911; People v. Craig, 196 Cal. 19, 25, 235 P. 721. Moreover, there is no showing that Abbott [the accused] was prejudiced. He was not entitled to be tried by a jury composed of any particular individuals. People v. Howard, 211 Cal. 322, 324–

325, 295 P. 333, 71 A.L.R. 1385. The juror who was substituted for Rettig was examined fully by both sides on voir dire, accepted as a qualified alternate and served as such from the start of the trial until seated as a regular juror. There is no claim that he was unable to render a fair verdict. It was not error to conduct the proceedings in chambers in Abbott's absence. No objection based·on this ground was made until after Rettig was discharged in open court, but even if we assume that Abbott is now in a position to raise the point, it is settled that the presence of a defendant is required only where it has a reasonably substantial relation to the fullness of his opportunity to defend against the charge. Snyder v. [Commonwealth of] Massachusetts, 291 U.S. 97, 105–108, 54 S.Ct. 330, 78 L.Ed. 674; People v. Isby, 30 Cal.2d 879, 893–894, 186 P.2d 405. The absence of Abbott during the proceeding in chambers could not have affected his right to a fair trial. The cases upon which he relies are readily distinguishable because they involved the original selection of a jury in such a manner that jurors unacceptable to the defendant either participated in the trial or may have done so. Lewis v. U. S., 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011; Hopt v. People of Territory of Utah, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262."

2. The pertinent portion of the statute of California dealing with alternate jurors is the same in substance as ours.

I see no merit in Bill No. 9, for in my view the trial judge in his discretion properly denied defendant's request for a further inspection of the airplane by the jury. Out of the presence of the jury, which had been withdrawn, he stated:

"Gentlemen, the Court feels this way about it. The Court granted an inspection of the plane to the members of the jury without the taking of any testimony at the scene, specifically restricting that there be no testimony taken at the scene, solely for the purpose of letting the jury, prior to the testimony of Mr. Odom and prior to the testimony of Mr. White, see the plane itself and the size of the plane and the manner in which the seats were arranged, and the jury inspected the plane. The Court does not believe that any demonstrations at the scene of the plane or any questions at the scene of the plane would help the jury in determining the questions of fact that have been testified hereto. The Court believes they are familiar enough with the plane, having examined it, to consider the evidence of all the witnesses in relation to it."

That portion of the general charge to which objection was made, which forms the basis of Bill No. 13, and which was found by the majority to be "unwise", reads:

"The law provides that the use of force or violence upon the person of another. is justifiable when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession; provided, that the force or violence used must be reasonable and apparently necessary to prevent such offense. Under this rule, the use of an unreasonable amount of force or violence to protect one's person or property would not be justifiable, and the test is what an ordinary person would deem to be a reasonable use of force or violence and what would appear to be necessary, rather than actual necessity, under the circumstances, to prevent the offense against one's person or property.

"In this connection, you are to consider all of the facts and circumstances as they appeared to the accused at the time of the alleged aggravated battery, and determine from those circumstances and at that time what would appear to an ordinary person to be a reasonable use of force or violence to prevent an offense against him. To further illustrate this rule—if it appeared to an adult that a small child was about to slap the adult with an open hand, it would not be reasonable or apparently necessary for the adult to maim or kill to prevent such offense. If the evidence establishes the use of any force or violence in this case and if justification is claimed as a defense under the law given above, it will be your province to determine if the force or violence was used for the purpose of prevent-

ing a forcible offense against a person or property, and to determine if the force or violence so used was reasonable and apparently necessary to prevent such offense."

I see nothing erroneous or prejudicial in this charge.

The trial judge overruled a motion for a new trial on the ground of newly discovered evidence, and Bill No. 15 was reserved. The judge says in his per curiam that the newly discovered evidence was cumulative in character, was merely corroborative of testimony which was intended to impeach the credibility of the prosecuting witness, and could have been discovered before or during the trial by the exercise of reasonable diligence (in fact it came to light the day after the verdict of guilty was rendered). Under the circumstances I think he properly refused a new trial under R.S. 15:511.

I respectfully dissent.

## ON APPLICATION FOR REHEARING.

### PER CURIAM.

In an application for a rehearing the prosecuting attorney contends, inter alia, that "it seems apparent" from a reading of the majority opinion that the Court was primarily concerned with the question of the guilt or innocence of the defendant. This is not a correct statement. The opinion plainly discloses that we were giving a résumé of the irreconcilable evidence so that we might " * * * properly evaluate and dispose of the errors alleged to have been committed, particularly those forming the basis of Bills of Exceptions Nos. 2, 9 and 15".

A reading of the opinion also reveals that, while we expressed disapproval of several rulings of the judge,[1] we did not hold that any of these rulings or omissions constituted reversible error.

Indeed, as clearly stated in the opinion, the most serious error committed in the case, on which our reversal of the conviction was primarily based, occurred when the judge virtually permitted the juror, Wolf, to recuse himself because he, the

1. Specifically, anent the propriety of some of the statements made by the district attorney in his opening statement to the jury (Bill of Exceptions No. 2); his failure to instruct the jury to disregard the statement of the district attorney (in interrogatory form) that the ball peen hammer, which he (the district attorney) was exhibiting to the jury, "Wouldn't take much for it to be a sledge hammer, would it?" (Bill of Exceptions No. 5); his refusal to grant defendant's request that the jury be permitted to return to the airfield so that they could again view the plane after they had heard the testimony of the prosecuting witness and defendant (Bill of Exceptions No. 9); his use of an illustration of a child and a man in stressing in his general charge the force necessary for a valid plea of self defense (Bill No. 13) and his failure to grant a new trial on the basis of newly discovered evidence (Bill No. 15).

juror, felt that there was a conflict of interest which might affect his verdict in the case. The rationale of our ruling on this bill of exception (No. 8) was that LSA–R.S. 15:362 requires the judge *himself* to ascertain *from the facts* whether there is *cause* which warrants the discharge of a juror while he is participating in the trial of the case; the judge may not accept the juror's conclusion that he is unable or disqualified to perform his duty, particularly (as in this case) where there has been no disclosure of the facts on which the juror's decision is based.

In the application for rehearing it is stressed that, even if error was committed by the judge in acting on the mere opinion of the juror, defendant was not prejudiced thereby because he was not entitled to be tried by a jury composed of any particular individuals. To support this argument, much reliance is placed upon certain dictum of the Supreme Court of California in People v. Abbott, 47 Cal.2d 362, 303 P.2d 730, which is quoted from at length in the dissenting opinion in the case at bar.

■■ ■■ It is, of course, true that an accused is not entitled to be tried by a jury composed of any particular individuals. But this simply means that the accused may not demand, in the selection of a jury, a particular individual or individuals whom he believes might be favorable to him. The situation is not the same after the jury has been selected and the case is on trial. For when jeopardy attaches we think it manifest that the accused has a right to have the particular jurors selected to try him decide his fate, save in cases of death, illness or any other cause which renders a juror unfit or disqualified to perform his duty as prescribed by LSA–R.S. 15:362. We regard this right of the accused to be a substantial one, the improper deprivation of which is prejudicial. Hence, Article 557 of the Code of Criminal Procedure (LSA–R.S. 15:557), which deals with harmless error, is inapplicable.

With due respect to the contrary dictum contained in People v. Abbott, supra, it suffices to say that we do not subscribe thereto.

The application for rehearing is denied.

HAWTHORNE, J., thinks a rehearing should be granted.