419 So.2d 899 (1982)
STATE of Louisiana
v.
James E. COPELAND.
No. 81-KA-1567.
Supreme Court of Louisiana.
September 7, 1982.
*901 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Duncan Kemp, Dist. Atty., William M. Quin, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
Ron S. Macaluso, Seale, Macaluso & Ross, Hammond, for defendant-appellant.
CALOGERO, Justice.
In this appeal from his conviction for first degree murder, James E. Copeland argues that the trial court erred in denying his motion for a new trial grounded on allegations that there were serious violations of the jury sequestration requirement in this capital case, that the jurors received gifts from the bailiffs in charge of the jury and that the trial judge, in the absence of defendant, determined that two jurors were competent to continue jury service. Because we find merit to this assignment of error, we reverse defendant's conviction and remand the case for re-trial.
The Grand Jury of Livingston Parish returned a true bill indicting defendant for the first degree murder of eleven year old "Cook" Owen in violation of La.R.S. 14:30.[1] Following the ten day trial the twelve member jury returned a verdict of guilty as charged, rejecting an insanity defense. The jury then considered penalty and, finding two aggravating circumstances under La.C. Cr.P. art. 905.4, unanimously recommended the death penalty. Defendant has assigned sixteen errors to the proceedings below.
Following conviction, the jury's recommendation of the death sentence, and the judge's sentencing defendant to death, defendant learned of certain activities involving the sequestered jury which had taken place during the trial. We remanded the case to the district court to allow defendant to file, and that court to act upon, a motion for new trial based upon newly discovered evidence. State v. Copeland, 401 So.2d 1207 (La.1981). We thereafter construed an order of the trial judge as a recusal of himself. State v. Copeland, 404 So.2d 1241 (La.1981). Another judge of the Twenty-First Judicial District Court conducted a hearing on the motion for new trial, following which the motion was denied.

Assignment of Error No. 14.
In this meritorious assignment of error, defendant contends that his motion for a new trial should have been granted. He complains first that certain conduct of the trial judge violated the sequestration rule of La.C.Cr.P. art. 791 and that he was denied his statutory right to be present during proceedings relating to the examination of jurors and/or "subsequent proceeding for the discharge" of two jurors. La.C.Cr.P. art. 831(3).
At the hearing on the motion for a new trial, defendant presented evidence which supported the following allegations contained in his motion.
(1) The trial judge during the trial and while the jury was sequestered, purchased alcoholic beverages for the jury.
*902 (2) The jury was aware during the trial that the trial judge personally was paying for the alcoholic beverages.[2]
(3) On at least two occasions during the trial the trial judge dined, and consumed alcoholic beverages, with the jury at a public restaurant.
(4) On at least two occasions during the trial the trial judge visited the jurors in their motel rooms where they were sequestered.
(5) During the trial the trial judge participated in a "social program" planned and performed by the impaneled jurors whereat "award certificates" signed by the trial judge reflecting the personalities and characteristics of each juror were presented.
(6) The trial judge participated in a "practical joke" perpetrated on a sequestered juror during the course of the trial.[3]
Defendant claims that the above involvements of the judge with the jurors violated the rules of sequestration. He also contends that the trial judge violated Code of Criminal Procedure Art. 831(3), and (5)[4] by privately quizzing, and counseling, two jurors, Dorothy Steadman and Doris McCahill.
After the impaneling of Dorothy Steadman but before the first witness was sworn, it came to the attention of the court that Ms. Steadman was "upset" that she might lose her job if she remained as a juror for the expected trial period of two weeks. Following the trial defendant discovered that this juror did in fact during the trial hear a rumor that she would probably be fired. Neither the prosecutor nor defense counsel had been notified of this event during trial. The trial judge learned of Ms. Steadman's problem and visited her at the motel where the jurors were sequestered to assuage her fears. He told her that he would secure other employment for her if she were fired.
Furthermore, six days into the trial, while the jury was sequestered in a room at the courthouse, Ms. McCahill became emotionally upset when she learned the case was to be postponed because one of the attorneys had to make a court appearance elsewhere. When the trial judge was notified, he went to the jury room and told Ms. McCahill to "pull herself together." He told the jurors that he would have to declare a mistrial unless they decided to continue with the trial. In addition, the trial judge informed the first alternate juror to be prepared to take Ms. McCahill's place.
Defendant claims that the preceding interchanges between the judge and the two jurors should have been surrounded by formalities, which included his presence and the presence of the prosecutor and defense counsel, so that defendant would have had the opportunity to evaluate the propriety of the proposed responses, or instructions, formulate objections or suggest a different solution to the problem at hand. Defendant urges this Court to set aside the verdict and sentence since he was not present on these two occasions, which were important stages of the trial.
Secondly, defendant notes that the sheriff's deputies (bailiffs) gave each of the jurors a handcuff stickpin at the social program *903 one night. The deputies were present at that social event when the gifts were presented. Although no juror called to testify on the motion for a new trial admitted to having been prejudiced in favor of the state because of this gift giving, it is defendant's contention that there was probably a subtle prejudicial effect because of this event. Defendant argues that since the deputies are aligned on the prosecution side, gifts from them are like gifts from the prosecutor, and they probably influenced the jury to view the state's position in the trial in a more favorable light. Such prejudicial improprieties cannot be countenanced, defendant contends.
Lastly, defendant points out that Dorothy Steadman and Doris McCahill had a confrontation during the guilt deliberations which seriously prejudiced defendant. Mrs. McCahill admitted that she threatened Ms. Steadman in response to Ms. Steadman's request that the jury consider a verdict of not guilty and not guilty by reason of insanity. Defendant claims that these two women were so emotionally distraught after two weeks of trial that they were incompetent to serve as jurors.
Considering the sum of the foregoing irregularities defendant asserts that his substantial rights have been violated such that his conviction should be overturned.
The trial judge who heard the motion for a new trial ruled in favor of the state. He noted (1) the imperative need for the trial judge to remain aloof from proceedings at trial, other than actions required of him in the courtroom, in order to maintain the integrity of the rules of sequestration; (2) the impropriety of the judge's quizzing and advising jurors other than in open court; and (3) the impropriety of the deputies' giving the handcuff stickpins to the jurors. Nevertheless, he denied the motion for a new trial.[5]
*904 First of all, we will not consider the testimony concerning the Steadman-McCahill juror encounter in the jury room during deliberations. It is well established law that "no juror, grand or petit, is competent to testify to his own or his fellows' misconduct, or to give evidence to explain, qualify or impeach any indictment or any verdict found by the body of which he is or was a member." La.R.S. 15:470; State v. Poree, 386 So.2d 1331 (La.1980). An exception to this rule exists when there is an unauthorized communication or overt act by a third person which creates an extraneous influence on the jury. State v. Sinegal, 393 So.2d 684 (La.1981). However, that exception is obviously not applicable to the jurors' relating details of a discussion among themselves, no matter how heated that discussion may have been.
The gift giving by the deputy-bailiffs and the judge-juror discourse, outside the presence of defendant, on the other hand, are proper matters for our inquiry and represent occurrences during the course of the trial which require reversal of defendant's conviction and sentence. We disapprove of the trial judge's fraternization with the jury, but do not ground our decision to reverse on that conduct.
With respect to the handcuff stickpins which were presented as gifts to the jurors by the deputy-bailiffs, we note that the motion judge characterized the giving of these gifts as "ill-advised ... particularly ill-advised because the handcuffs are symbolic of `law enforcement.'" Such gift giving has no place in the conduct of a serious criminal case such as this and quite likely did constitute a subtle influence, pro state, the full extent of which is impossible to ascertain. Furthermore, the jurors' testimony that they were uninfluenced thereby, however honest and candid, can hardly be dispositive on the issue, considering the subtlety of the influence. As set forth in State v. Wisham, 371 So.2d 1151, 1153 (La.1979): "The defendant's constitutional due process right to fair trial by jury is violated if the trial jurors are subjected to influences through the attending bailiffs which may cause their verdict to be influenced by circumstances other than the evidence developed at the trial." Accord: State v. Marchand, 362 So.2d 1090 (La. 1978). The state's argument that this case is distinguishable from Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1964), in which the United States Supreme Court reversed the conviction because the deputy sheriffs who were in charge of the sequestered jury were also principal witnesses at trial, misses the point. Admittedly, the deputy-bailiffs in charge of the jury were not themselves state witnesses at trial as was the case in Turner. However, the focus here is different from Turner where the jury had to weigh the credibility as witnesses of the very bailiffs into whose care they were entrusted. In this case we have a situation in which the jurors were subjected to an influence through actions of the attending deputy-bailiffs which might have caused their verdict to be based upon something other than the evidence presented at trial. State v. Wisham, supra.
The contacts between the trial judge and the jury fall into two categories. One involves defendant's right to be present during juror interrogation and the other concerns sequestration. Code of Criminal Procedure article 831 requires that a defendant charged with a felony be present "at the calling, examination, challenging, impanelling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or a juror." The defendant was *905 not present when the trial judge spoke with either of the individual jurors about her problems with jury service. The trial judge admitted that neither defendant, his counsel, nor the prosecutor was present on these occasions.
When the trial judge spoke with Ms. Cahill about her being emotionally distraught, a discussion in the presence of the entire jury, he expressed only one solution which is available when a juror can no longer serve, mistrial. At least one other solution is to excuse the juror(s) and use an alternate juror or jurors.[6] La.C.Cr.P. art. 789. While the judge's comment about a mistrial does not rise to the level of that found coercive in Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965), it nevertheless can be viewed as putting pressure on the jurors. Furthermore, the judge's less than complete explanation of the alternatives available if a juror (or even two) were unable to continue could well have been pointed out by counsel for defendant or for the state. Neither had the opportunity to do so because the judge made this communication with the jurors outside the presence of defendant and counsel. In essence, the trial judge quizzed the two jurors and determined that they were able to continue to serve on the jury without complying with La.C.Cr.P. art. 831(3)'s mandate that defendant be present at such stage of the proceedings.
The above analysis of the judge's discourse concerning Ms. McCahill is equally applicable to the discussion between the trial judge and Ms. Steadman after the latter heard the rumor that she might lose her job. Upon that occasion, the trial judge, outside the presence of the defendant, made a determination that this juror was capable of continuing service on the jury. He testified at the motion hearing that his conversing with Ms. Steadman was prompted by his desire to have Ms. Steadman "avoid any problems that she may have encountered mentally."
This Court spoke clearly on the issue of a trial judge's determining the competency of a juror to continue service on a jury once that juror has been impaneled, when it said in State v. White, 244 La. 585, 153 So.2d 401, 408 (1963):
[T]he ex parte hearing in the judge's chambers was a clear violation of the well-settled rule universally obtaining that an accused must be present at each and every stage of the trial from arraignment to sentence. Under this jurisprudence and law it is well established that the absence of the defendant from the courtroom during the questioning, challenging, and/or selecting of a juror has the effect of vitiating the entire proceedings. [citations omitted].
In our view, there is no difference between a hearing in the judge's chambers, as disapproved in White, supra, and a discussion in the jury room or a motel room between the judge and a juror. The trial judge, outside the presence of defendant, determined that these jurors were capable of continuing to serve on the jury. As stated in White, supra, defendant's absence during this important event in the course of his trial "has the effect of vitiating the entire proceedings."
Because we find sufficient prejudice to warrant reversing defendant's conviction and sentence in the deputy-bailiff gifts to the jurors and the judge-juror colloquies outside the present of defendant, we need not decide whether the social contacts between the trial judge and the jury, albeit improper, rise to the level of reversible error.
With respect to these social contacts, La.C.Cr.P. art. 791[7] which is designed to *906 prevent "outside communication" does not bar communication between the judge and jury when such communication is within the bounds of trial related necessity. Nevertheless, a jury is sequestered by being kept together "in the charge of an officer of the court," not in the charge of the trial judge.
The trial judge was no doubt well-intentioned in these contacts with the jury. The jurors had to spend almost two weeks sequestered, away from family and friends, in what some of them probably considered a hostile environment. Additionally, the suspect contacts may perhaps not have been quite as gross as they appear.
The "practical joke" to which defendant refers in his motion for a new trial probably resulted from the judge's too familiar attitude toward the jury. On this occasion the trial judge allowed the bailiffs to borrow his robe so that a juror could wear it and sit at the bench "playing" judge. During this charade, by pre-arrangement, the trial judge entered the courtroom and "caught" the juror in her role as judge. A trial judge should not participate in such activity during the course of a trial.
Concerning the social program at which the stickpins and certificates were presented, we normally would not explore intra-jury activity, even that of a social nature, unless there is involved "outside communication" or impairment of the jurors' ability to function in the manner required of them. The trial judge's participation in that social activity is a different matter.
After having dined with the jury at a local restaurant, the trial judge returned with the jury to the motel where they were sequestered for a social program. At the social program each juror received a "Certificate of Participation" which had been signed by the trial judge. When presented to the trial judge for his signature, each certificate already had printed upon it the name of the juror who was to receive it and the "award" being presented. Examples of these were: "the Clark Gable Award of Quiet, Dry Wit," "The James Brown-Mr. Show Biz Award," "the OooWee Award," "the Sweetest Bank Teller in Town Award," "the Pipe-Smoking, Could You Repeat That Judge Award," "the Come On Down, Tell it Like It Is Award,: and "the Oh...! Ms. Congeniality Award." The judge's signing these certificates might be construed as not simply condoning, but actually encouraging an attitude of frivolity which might better be avoided by a body charged with the serious responsibility of deciding defendant's guilt or innocence and whether he should live or die. Furthermore, this social program took place on Thursday evening before the issue of defendant's guilt was submitted to the jury at 11:00 p. m. Friday.
Finally, we observe that dining with the jury on at least two occasions was far removed from trial necessity. The judge could easily have satisfied his concern that the jury was receiving adequate care by inquiring of the bailiffs about the food and other accommodations being afforded the jury.
The motion judge was correct in his belief that "the trial judge in a criminal jury trial must remain totally aloof from any proceeding, other than actions required of him in the courtroom." Aloofness is necessary to maintain the integrity of the rules of sequestration and to avoid the appearance of impropriety. While we need not determine whether the trial judge's drastic departure from aloofness created reversible error, we do emphasize that a trial judge's communication with a sequestered jury is to be limited to that necessitated by the trial.
*907 We do not suggest that a sequestered jury may not engage in recreational activities when trial is not in progress or when they are not engaged in deliberations. Also the solicitude of the trial judge for the comforts of the jury during the period of sequestration is admirable. However, the integrity of the judicial system is compromised when a trial judge puts aside the aloofness required by his position as arbiter to fraternize with the jury.
Defendant has assigned error to several matters which are likely to arise at retrial and, consequently, we address those assignments in this opinion.

Assignment of Error No. 2
Defendant argues that the trial court erred in denying a defense motion for individual voir dire. Initially the trial judge granted the defendant's motion for individual voir dire and sequestration of jurors during voir dire. However, after the first day, on which only five prospective jurors had been questioned, the trial court reversed its original ruling. The judge decided to advise a number of the jurors on the law at the same time. He would then take twelve prospective jurors for the voir dire while the remainder were sequestered. The judge felt this would be a more expedient method of selecting the jury. He added that, if during the examination prejudice were to occur, he would excuse all twelve for cause.
Defendant argues that once the trial judge determined that special circumstances were present which required an individual voir dire under State v. Lindsey, 404 So.2d 466 (La.1981), he was bound by that decision. Defendant claims that then to discontinue the individual voir dire was an abuse of discretion.
As the Court restated in Lindsey, supra, there is no provision of law which either prohibits or requires the sequestration of prospective jurors so as to facilitate conducting individual voir dire. A capital case does not create a per se exceptional circumstance, without a need for a further showing, to prove a need for an individual voir dire. The judge in the instant case substituted an alternative method to the completely individual voir dire. In the absence of a showing that the particular voir dire in this case would not ensure defendant a fair trial the defendant herein is in no position to complain about the alternative voir dire method. Lindsey, supra.

Assignment of Error No. 11
Defendant urges by this assignment that the trial court erred in denying the defense motion to suppress the accused's confession procured during a period of illegal detention.
Although the victim's body was discovered on Saturday morning, July 7, 1979, in Livingston Parish, it was not identified until Sunday afternoon, July 8, 1979, after his family filed a missing juvenile report with the East Baton Rouge Parish Sheriff's Department. After the identification was made, Sgt. Dwayne Jones of the East Baton Rouge Sheriff's Department interviewed the family at the Kleinpeter Substation (the substation in the police district of the family residence) in order to piece together a picture of what might have happened.
The family interview disclosed that the child had participated in "popping" firecrackers at a house down the street on July 4, 1979. One of the sisters stated that the child was told by one of the residents that he was bisexual and the older resident had at one time tried to grab the child. Other than that information, the only fact that was elicited was from Timmy Scardina, the mother's boyfriend, who stated the boy left the house about 8:30 p. m. Friday evening to look at television at a neighbor's house. Thereafter, the investigating team, headed by Captain Bueto, reviewed the facts and decided to canvass the neighborhood with pictures of the child to find someone who had last seen the boy.
The canvass began about 5:00 p. m. with teams of two deputies each. Sgt. Jones testified that he had been to five or six houses prior to approaching Copeland's residence. *908 The procedure at each house was the same: The officers knocked on the door, identified themselves, asked if the occupants knew the Owen boy, and when last they had seen him. James Copeland answered the door when the deputies knocked. At first he denied knowing the boy; but on second look at the photograph, he acknowledged that the child was at his residence on the Fourth of July for fireworks. The deputies continued to question him and he further indicated that he had last seen Joseph Owen about 8:00 or 8:30 p. m. on Friday, July 6, 1979. Copeland also provided the deputies the name of his roommate, George Brooks. Upon completion of the canvass, the deputies reported back to Capt. Bueto. The only person who had seen the boy on Friday evening, outside of his family, was James Copeland. Capt. Bueto directed Sgt. Jones to return to Copeland's house to see if he would come to the substation for further questioning. When Sgt. Jones returned to Copeland's, he requested that Copeland come to the station to help with the investigation. Copeland agreed to come with no qualms, and he left a note for his roommate concerning his whereabouts. Sgt. Jones testified that Copeland was not arrested or handcuffed at that time, that he voluntarily went to the substation with the deputies.
Sgt. Jones read Copeland his rights before interviewing him. After about 30 or 40 minutes of discussion with Copeland, Jones informed Capt. Bueto that he felt Copeland knew more than he was saying. Jones presented Copeland a written rights waiver, stating the nature of the interview. Copeland signed the waiver form, (acknowledging the interview regarding Joseph Owen's murder) on July 8, 1979, at 6:27 p. m. After further questioning, Copeland made his first statement shortly before 8:00 p. m. implicating himself in Owen's murder, although, he claimed that it was his companion George Brooks who had sexually molested the boy and killed him. Then Copeland gave a taped statement, after which he was arrested, at about 8:24 p. m.
In the meantime, George Brooks had come to the substation. He was thereupon arrested and booked for the murder also. Eventually, defendant admitted his role in the sexual assault on the boy and that he pulled the trigger of the shotgun.
At the motion to suppress, defendant did not refute Sgt. Jones' version of the facts leading up to defendant's statement. Although defendant claimed that he was told by a deputy that the police suspected George Brooks was involved in the murder and not him, Copeland could not identify or name the deputy.
Capt. Bueto testified at the motion to suppress that Copeland was not a suspect in the crime at the time that he was asked to come to the substation. The investigation did not begin to focus on Copeland until after he was read his rights, and was interviewed for approximately thirty minutes. Bueto stated that they were looking for anyone who could provide information on Joseph Owen's activity that Friday night.
Defendant argues that the statements were "unconstitutionally seized" since he was escorted to the police station for questioning without being informed that there was no legal obligation to comply and that he was the subject of the murder investigation. In addition, defendant argues that the statements were "unconstitutionally seized" since the defendant was subjected to custodial questioning on less than probable cause for a legal arrest.
Defendant bases his first argument on this Court's holding in State v. Menne, 380 So.2d 14 (La.1980), which suppressed Menne's confession since the Miranda warnings were not given when Menne was clearly detained and the police indicated he was a primary suspect in the murder. Defendant overlooks the basic difference between Menne, supra, and the case at bar. In Menne, the defendant was called on the phone and asked to come to the police station for an interview. Menne was interviewed by two officers for an hour. The officers told Menne that he was the last person with the murder weapon before the victim's death and that they believed he knew more about the crime than he revealed. Menne then admitted the crime, *909 after which he was advised of his rights for the first time. Conversely, in the case at bar, defendant was orally advised of his rights before the interview began, thus providing the appropriate constitutional safeguards. After 30 or 40 minutes of questioning, when Sgt. Jones became suspicious that Copeland knew more about the crime than he had yet revealed, he had Copeland execute a formal, written waiver of rights form. At no time did defendant ask to have an attorney or refuse to answer questions. Therefore the proper procedural safeguards, as established by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), for custodial interrogation of a defendant, were properly used in the case at bar, even assuming that defendant was "in custody" at the time the questioning took place.
Secondly, defendant argues that his statements should be suppressed since they were the result of a custodial interrogation on less than probable cause for a warrantless arrest. However, defendant fails to consider the testimony, which remains unrefuted, that he voluntarily went to the police substation. As set forth in State v. Bourgeois, 388 So.2d 359, 363 (La. 1980), "[t]he statutory definition of `arrest' is keyed to the concept of restraint. It is the circumstances indicating an intent to effect an extended restraint on the liberty of an accused, rather than the precise timing of an officer's statement, `You are under arrest,' that is determinative of when an arrest is actually made." It is not clear in this case precisely when the ineffable shift from a noncustodial to a custodial relationship occurred. State v. Redic, 392 So.2d 451, 454 (La.1980). It is clear, however, that the authorities invited defendant to the stationhouse at a time when he was not the focus of the investigation, that defendant came voluntarily, and that the officers did not manifest an intention to restrain his liberty forcibly until after the first statement was made. Under these circumstances, the statements were not the product of a prior illegal arrest or detention of the defendant. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); see, State v. Thibodeaux, 414 So.2d 366 (La.1982); State v. Statum, 390 So.2d 886 (La.1980). Therefore, the police did not need probable cause to interview defendant. Furthermore, after he voluntarily arrived at the substation, he was given his Miranda rights before the interview began. Thus, defendant cannot complain that he was not informed of his constitutional rights.
Since both arguments herein are groundless, this assignment lacks merit.

Assignment of Error No. 15
The jury which was ultimately chosen consisted of one or more persons who as a member of a panel of twelve prospective jurors had been exposed to the trial court's instruction regarding defendant's eligibility, if convicted and sentenced to life imprisonment, for pardon. Although defense counsel failed to lodge a contemporaneous objection, he now submits this assignment of error on appeal.
The following is the initial discussion about pardon, which continues for two additional pages in the transcript.
Q. For how many years?
Q. Life imprisonment.
A. Forever until he dies?
Q. Life imprisonment.
BY MR. QUIN:
Your Honor, this should be explained, because the impression Mr. Macaluso is making is that it will be forever until he dies. That is not true. So if the lady wants to know what it means I would ask Your Honor to explain it.
BY MR. MACALUSO:
I will ask the Judge to instruct now.
A. I don't understand that.
BY THE COURT:
... I am going to assure you that he is eligible for pardon.
BY MR. QUIN:
After how many years Judge?
BY THE COURT:
After X number of years.

*910 BY MR. LAVIGNE:
You don't know how many years?
BY THE COURT:
I have no idea how many years. I am not even going to relate that at this present time. I will, if specifically requested, instruct it later on, but life does not mean infinity. It is sometimes inferred to mean infinity.
Ordinarily, this Court would find that the issue had not been preserved for review under La.C.Cr.P. art. 841. However, an exception is made in a capital case because the Court has an obligation to examine the record for passion, prejudice or arbitrary factors which may have contributed to the death penalty recommendation. Lindsey, supra.
This Court in Lindsey, supra, stated that conditions under which a person sentenced to life imprisonment without benefit of parole, probation or suspension of sentence can be released at some time in the future is not a proper consideration for a capital sentencing jury and shall not be discussed in the jury's presence. The trial judge in the instant case discussed the possibility of a pardon with prospective jurors, one of whom not only served at the guilt phase of the trial, but also at the sentencing phase. Considering the extensive pardon discussion on voir dire, it seems unlikely that the jurors were not influenced by that consideration at the sentencing hearing. At no time were the jurors admonished to disregard the considerations of a pardon as suggested in Lindsey. Although the language in Lindsey, supra, deals with a pardon discussion at a sentencing hearing rather than on voir dire, this Court said that "the magnitude of the potential for arbitrary decision making and the irrelevance of future remedies to the jury's duty weigh heavily in favor of an almost blanket prohibition of the discussion of such matters." 404 So.2d at 487.
In view of the strong language of this Court in State v. Willie, 410 So.2d 1019, (La.1982)[8], the discussion of pardon on voir dire in the case at bar would likely constitute a basis for reversal of the sentence and remand for retrial of the sentence phase had we not already determined that defendant is entitled to a new trial entirely.

Decree
Having determined that the trial court erred in denying defendant's motion for a new trial, we reverse that ruling and remand the case for retrial.
REVERSED AND REMANDED FOR RETRIAL.
LEMMON, J., concurs.
MARCUS and WATSON, JJ., concur and assign reasons.
WATSON, Justice, concurring.
The actions of the trial judge in this case are an unbelievable departure from the standards of judicial conduct in any jury case, and especially one involving a first degree murder charge. The conviction must be set aside and the case remanded for a new trial.
I respectfully concur.
MARCUS, Justice (concurring).
I agree that defendant is entitled to a new trial in this case. Hence, I do not *911 reach the issue of whether discussion of pardon on voir dire, without objection, would constitute a basis for reversal of the sentence. Accordingly, I respectfully concur.
NOTES
[1] The Grand Jury also indicted George Brooks for this offense. The trial judge ordered the venue for Copeland's trial changed from Livingston Parish to Tangipahoa Parish. Brooks' conviction is currently pending on appeal.
[2] Relative to the first two allegations, the evidence at the hearing on the motion for a new trial showed that it was defense counsel who requested that the jury be allowed alcoholic beverage with dinner. The trial judge explained that he paid for these beverages because the parish did not have funds to do so and defense counsel did not volunteer to pay for them.
[3] As will be discussed later, this allegation addresses itself to an occasion upon which the trial judge "caught" the juror wearing his robe and playing judge.
[4] Art. 831 concerning the presence of defendant when prosecution is for a felony provides:

A defendant charged with a felony shall be present:
. . . . .
(3) At the calling, examination, challenging, impanelling, and swearing of the jury, and at any subsequent proceeding for the discharge of the jury or of a juror;
. . . . .
(5) In trials by jury, at all proceedings when the jury is present, and in trials without a jury, at all times when evidence is being adduced; and
. . . . .
[5] The entirety of his reasons were as follows:

The Court could not find a scintilla of evidence that any of the jurors were influenced either way by any action of [the trial judge] (sic).
This Court must make the observation that [the trial judge's] understanding and beliefs about the role of the trial judge during a criminal jury trial, and his belief about what contact with the jury is acceptable, even though they are very honest, very sincere beliefs, are at a fairly wide variance with this Court's understanding and beliefs. This Court believes that the trial judge in a criminal jury trial MUST remain totally aloof from any proceeding, other than actions required of him in the courtroom. This is an aloofness not born out of indifference or disregard or lack of concern about the rights of the accused and the comforts and conduct of the jury. This is an aloofness born out of the absolute necessity of totally maintaining the integrity of the rules of sequestration. In retrospect, in [sic] would have avoided most of the problems of this motion. The "bottom line" question is whether a presumption of sequestration violations were overcome by the evidence. The Court is of the very firm opinion that, as pointed out above, the presumptions were totally dispelled by the evidence and the defendant's rights were not violated.
The Court considers the most serious allegations to be those related to the judge's actions in visiting the jury room and speaking with the jurors. On one occasion, the judge visited the jury when a juror learned something about her job, and the other when it was reported that another juror was distressed about being away from her family. This Court very carefully examined the record and the testimony of these jurors at the hearing on this motion for evidence of misconduct, but could find none. These situations were both matters that should have been discussed with both counsel for the state and defense. The Court is of this opinion, because, in both of these situations, there is a possible question of jury qualification involved. It is equally clear that the purpose of [the trial judge's] visiting the jury room, and the result thereof, is the same. The testimony is abundantly clear that none of the rights of the defendants were violated. The result of the visits were the same as it would have been if the jury had been recalled to the courtroom and had been told the same thing by the judge in the presence of the defendant, his counsel and counsel for the state.
The Court feels that any presumptions of sequestration violations were overcome by the evidence adduced at the hearing on the motions.
The remaining allegation has to do with the acts of the deputies assigned to maintain the sequestration of the jury. The only serious portion of this allegation is the giving of the "stick pin." There is no question about the fact that this was done without any effort whatever on the part of the said deputies to exert any influence on the jury. It is equally obvious from the evidence that it had nothing whatever to do with the ultimate decision reached by the jury. There was nothing prejudicial to the rights of the defendant.
This Court must make the observation that this particular conduct was ill-advised. It would have been so even if the "gift" had been a strawberry pin or some other object. It was particularly ill-advised because the handcuffs are symbolic of "law enforcement." It resulted from the fact that the deputies and bailiffs all wore the pins themselves. The jurors saw them and admired them. It would probably be best for the deputies and bailiffs to avoid this problem in the future by not wearing such a "symbolic" piece of jewelry during any instances where there would be visual contact with the jury.
[6] Two alternate jurors had been seated in the instant case and were available.
[7] Code of Criminal Procedure Article 791 provides that:

A. A jury is sequestered by being kept together in the charge of an officer of the court so as to be secluded from outside communication, except as permitted by R.S. 18:1307.2 [which allows a member of a sequestered jury to vote by absentee ballot].
B. In capital cases, after each juror is sworn he shall be sequestered.
C. In noncapital cases, the jury shall be sequestered after the court's charge and may be sequestered at any time upon order of the court.
In State v. Parker, 372 So.2d 1037, 1038 (La. 1979), we explained, "The purpose of the sequestration is to insulate the jurors from outside influence or the possibility thereof, even unconscious; and, in capital cases especially, the sequestration is strictly enforced so that, upon a separation of a juror after he is sworn, a presumption of misconduct arises and reversible error will be presumed. [citations omitted]." (emphasis in the original.)
[8] For these reasons and others, this court has held that conditions under which a person sentenced to life imprisonment without benefit of parole can be released at some time in the future are not a proper consideration for a capital sentencing jury and shall not be discussed in the jury's presence. Further, in reviewing a capital case in which an offender's potential for future release has been injected into the proceedings by the state or the trial court, this court must presume that a death sentence was imposed under the influence of an arbitrary factor unless the record clearly indicates that the jury was properly informed of its duty and admonished to disregard the improper remarks, and the record indicates that the jury heeded the admonition. State v. Lindsey, 404 So.2d 466 (La.1981); See also, State ex rel., Williams v. Blackburn, 396 So.2d 1249 (La.1981); State v. Monroe, 397 So.2d 1258 (La.1981); State v. Sonnier, 379 So.2d 1336, 1364 (La.1979) (Dennis, J., concurring in part and dissenting in part); State v. Sonnier, supra at 1368 (on rehearing). 410 So.2d at 1033.