STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2023 KA 0293

STATE OF LOUISIANA

VERSUS

JAYLON K. BROWN

Judgment Rendered: **NOV 2 8 2023**

* * * * *

On Appeal from the
18th Judicial District Court
Parish of Iberville, State of Louisiana
Trial Court No. 32-20

The Honorable Elizabeth A. Engolio, Judge Presiding

* * * * *

Antonio "Tony" M. Clayton
District Attorney
Terri Russo Lacy
Assistant District Attorney
Port Allen, Louisiana

Attorneys for Appellee,
State of Louisiana

Mary Constance Hanes
Louisiana Appellate Project
New Orleans, Louisiana

Attorney for Defendant-Appellant,
Jaylon K. Brown

* * * * *

BEFORE: WELCH, HOLDRIDGE, AND WOLFE, JJ.

Holdridge J. agrees in part, dissents in part

**WOLFE, J.**

The defendant, Jaylon K. Brown, was charged by grand jury indictment with two counts of second degree murder, violations of La. R.S. 14:30.1(A)(1). He pled not guilty. Following a jury trial, the defendant was found guilty of second degree murder on count one, and guilty of the responsive verdict of manslaughter, a violation of La. R.S. 14:31, on count two. The trial court denied the defendant's motions for new trial and post-verdict judgment of acquittal. For the second degree murder conviction, the defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. For the manslaughter conviction, the defendant was sentenced to forty years imprisonment at hard labor, to run concurrently with the life sentence. The defendant now appeals, designating as error the sufficiency of the evidence on both counts and the trial court's removal of a juror who appeared to be sleeping. For the following reasons, we affirm the convictions and sentences.

## STATEMENT OF FACTS

On December 28, 2019, at approximately 9:36 p.m., officers responded to a 911 call from the victim, Dararius Evans, near the Louisiana State University Agricultural Center ("LSU Ag Center") in St. Gabriel, Louisiana. Evans stated that he had been shot by "Sneaks." Upon arriving at the scene, St. Gabriel Police Officer Sterling Redditt observed a vehicle in a ditch, that had crashed into a white tank. Officer Redditt discovered Evans slumped over in the front seat and bleeding from an unknown wound, and found Aleysia Maynor, the other victim, bleeding from her neck in the front passenger seat. Maynor was pronounced deceased at the scene, while Evans was transported to the hospital where he later died.

2

Through the investigation, Detective James Andre Williams, Sr., with the St. Gabriel Police Department, learned that "Sneaks" was the defendant's nickname.[1] The defendant was brought in for questioning and advised of his **Miranda**[2] rights, after which he gave two statements denying any involvement in the shooting, but admitting to meeting with Evans and Maynor. In his third statement to police, the defendant confessed that, during an altercation, he shot Evans in self-defense and Maynor was accidentally shot. He then threw the gun in a storm drain in Baton Rouge. At that point, the defendant was arrested for the murder of Aleysia Maynor and the attempted murder of Dararius Evans. When Evans later passed away from his injuries, the defendant was arrested for his murder.

## SUFFICIENCY OF THE EVIDENCE

In his first assignment of error, the defendant argues that the evidence is insufficient to support his convictions for the second degree murder of Evans and manslaughter of Maynor. Specifically, the defendant contends that the State failed to prove beyond a reasonable doubt that he did not kill Evans in self-defense, and failed to prove that he killed Maynor.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV, § 1; La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime and the defendant's identity as the perpetrator of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Oliphant**, 2013-2973 (La. 2/21/14),

---

[1] "Sneaks" is sometimes spelled "Sneaksz" or "sn3aksz" in the record.

[2] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3

133 So.3d 1255, 1258-59 (*per curiam*); **State v. Bessie**, 2021-1117 (La. App. 1st Cir. 4/8/22), 342 So.3d 17, 22, writ denied, 2022-00846 (La. 9/20/22), 346 So.3d 802. The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Dyson**, 2016-1571 (La. App. 1st Cir. 6/2/17), 222 So.3d 220, 228, writ denied, 2017-1399 (La. 6/15/18), 257 So.3d 685. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. **Oliphant**, 133 So.3d at 1258; **State v. Dunn**, 2021-0630 (La. App. 1st Cir. 12/22/21), 340 So.3d 77, 83-84, writ denied, 2022-00095 (La. 4/5/22), 335 So.3d 834.

The due process standard does not require the reviewing court to determine whether it believes the witnesses or whether it believes the evidence establishes guilt beyond a reasonable doubt. **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (per curiam). Rather, appellate review is limited to determining whether the facts established by the direct evidence and inferred from the circumstances established by that evidence are sufficient for any rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **State v. Gardner**, 2016-0192 (La. App. 1st Cir. 9/19/16), 204 So.3d 265, 267. The weight given evidence is not subject to appellate review; therefore, an appellate court will not reweigh evidence to overturn a factfinder's determination of guilt. **State v. Livous**, 2018-0016 (La. App. 1st Cir. 9/24/18), 259 So.3d 1036, 1040, writ denied, 2018-1788 (La. 4/15/19), 267 So.3d 1130.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Though intent is a question of

4

fact, it need not be proven as a fact, and may be inferred from the circumstances of the transaction. **State v. Currie**, 2020-0467 (La. App. 1st Cir. 2/22/21), 321 So.3d 978, 983. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. **Id.** Specific intent is an ultimate legal conclusion to be resolved by the factfinder. **State v. Coleman**, 2017-1045 (La. App. 1st Cir. 4/13/18), 249 So.3d 872, 877, writ denied, 2018-0830 (La. 2/18/19), 263 So.3d 1155.

A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1). However, an aggressor may not claim self-defense without showing he first withdrew from the conflict in good faith and in such a manner that his adversary knew or should have known of his intention to withdraw and discontinue the conflict. See La. R.S. 14:21; **State v. Reed**, 2014-1980 (La. 9/7/16), 200 So.3d 291, 309, cert. denied, 580 U.S. 1166, 137 S.Ct. 787, 197 L.Ed.2d 258 (2017). When self-defense is raised as an issue by the defendant, the State has the burden of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense. Thus, the issue in this case is whether a rational factfinder, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant did not kill the victim in self-defense. **State v. Hall**, 2013-0014 (La. App. 1st Cir. 9/13/13), 2013 WL 5177542, *6 (unpublished), writ denied sub nom., **State ex rel. Hall v. State**, 2013-2488 (La. 5/30/14), 140 So.3d 1168. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **Dunn**, 340 So.3d at 86.

5

Manslaughter is a homicide which would be either first degree murder or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1). Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. The existence of "sudden passion" and "heat of blood" are not elements of the offense but rather, are factors in the nature of mitigating circumstances that may reduce the grade of homicide. Manslaughter requires the presence of specific intent to kill or inflict great bodily harm. **State v. Mellion**, 2021-1116 (La. App. 1st Cir. 4/8/22), 342 So.3d 41, 45, writ denied, 2022-00732 (La. 6/22/22), 339 So.3d 1186, cert. denied, ___ U.S. ___, 143 S.Ct. 319, 214 L.Ed.2d 141 (2022).

Detective Williams was one of the lead detectives in the case. Detective Williams testified that, upon arriving at the scene, Evans stated that "Sneaks" shot him. Based on that information, Detective Williams looked through Evans's phone and saw a contact labeled "Sneaks." Detective Williams sought and obtained search and seizure warrants for the phone records of Evans, Maynor, and the phone number listed under the contact "Sneaks," which belonged to the defendant. The phone records indicated that on the day of the shooting, Evans texted the defendant and asked if the defendant could meet with him to loan him some money.[3]

In the course of his investigation, Detective Williams also retrieved and reviewed surveillance video footage from St. Gabriel Groceries, or "Wayne's Grocery," which is only "[a]bout two minutes" from the LSU Ag Center where the crime occurred. The surveillance footage showed Evans's vehicle passing in front

---

[3] Although the defendant is identified as "Lil Walk Down" in the text message extractions, the phone number listed belongs to the defendant.

6

of Wayne's Grocery at 9:32 p.m.[4] The investigation further showed that Evans's, Maynor's, and the defendant's phones were located inside Evans's vehicle as it passed by Wayne's Grocery. At 9:35 p.m., Evans called 911 to report that he had been shot.[5]

Timothy Piper, an expert in historical cell site location data, examined the phone records of Maynor, Evans, and the defendant. Piper testified that from approximately 8:43 p.m. until 9:32 p.m., the phone records of Maynor, Evans, and the defendant demonstrate that all three individuals were together. At approximately 8:43 p.m., Evans, Maynor, and the defendant began traveling together from St. Gabriel to Gonzales, Louisiana. Evans, Maynor, and the defendant then traveled back to St. Gabriel, where all of their phones pinged off the same cell tower near Wayne's Grocery at around 9:32 p.m. Piper concluded that, based on the locations of the phones, Evans, Maynor, and the defendant were together when Evans called 911 at 9:35 p.m. However, at 9:38 p.m., the defendant's phone began to travel away from St. Gabriel towards Baton Rouge. From 10:17 p.m. to 11:17 p.m., the defendant's phone pinged off a "small cell" tower[6] in Baton Rouge. The murder weapon was found within the serving radius of the "small cell" tower. According to Piper, the phone records were consistent with Evans's car, carrying Evans, Maynor, and the defendant, passing in front of Wayne's Grocery at 9:32 p.m. and arriving at the crime scene where Evans called 911 at 9:35 p.m. Moreover, the defendant's phone was never in range of the cell tower servicing the defendant's girlfriend's

---

[4] The video recorded the time as 10:32 p.m., but the camera was one hour off. Detective Williams confirmed this when he spoke with Ms. Roy, who worked at Wayne's Grocery. Detective Williams looked at the current time on his watch and the time displayed on the camera, and there was a one-hour discrepancy.

[5] Detective Williams testified that Evans called 911 at 9:36 p.m. However, the call was actually placed at 9:35:58 p.m.

[6] A "small cell" tower has a coverage range of only 1,000 to 1,200 feet.

house and thus, the defendant's phone could not have been at the defendant's girlfriend's house as he initially claimed.

Danielle Downy, a crime scene analyst at the Louisiana State Police Crime Lab and an expert in the field of crime scene investigation, processed the crime scene and conducted a trajectory analysis of the shots fired in Evans's vehicle. Downy identified six shots fired in the vehicle, excluding the two shots that killed the victims. Shot "A" traveled through the front driver's side window and lodged itself in the driver's side view mirror. Shot "B" hit the front driver's side door panel, ricocheted, and landed in the speaker. Shot "C" perforated the driver's seat near the front then exited the seat, which would "be consistent with [the driver] being shot in the leg." Shot "D" entered the back of the driver's seat, ricocheted inside the seat, and exited up towards the sunroof. Downy testified that based on where the bullet entered, it would be "highly unlikely" for the shooter to be sitting in the middle of the backseat when shot "D" occurred. Shots "E" and "F" traveled in the direction of the passenger side. Based on the trajectory of shot "F," Downy stated that she would not expect that shot to originate from someone sitting in the driver's seat. Downy further testified that a gun going off once is inconsistent with the three shots, including the one that killed Maynor, which struck the passenger side of the vehicle. On cross-examination, Downy conceded that the trajectory of the shots would be consistent with the shooter firing as they were exiting the vehicle.

Chelsea Richardson, a firearms examiner at the Louisiana State Police Crime Lab and an expert in the field of firearms examination, conducted a ballistics analysis on the gun recovered from the storm drain and the shell casings collected from the crime scene. Richardson determined that all eight cartridge cases collected from the crime scene were fired from the firearm that the defendant hid in a storm drain. The bullet retrieved from Maynor's head was likewise fired from the same gun.

8

Richardson testified that the gun was not automatic and that a shooter would have to pull the trigger each time for it to fire.

Dr. Michael Defatta, a forensic pathologist at the St. Tammany Parish Coroner's Office and expert in the field of forensic pathology, performed the autopsies on both Maynor and Evans. The gunshot wound to Evans's back had a back-to-front and slight upper trajectory. The two gunshot wounds to Evans's right leg had a higher entry and indicated more of a downward trajectory, which is consistent with a shooter seated in the middle of the backseat. Maynor had a close-range gunshot wound behind her left ear, along with "stippling" and soot surrounding the wound. Dr. Defatta noted that soot and stippling are present when the shooter is less than twelve inches away. Moreover, Dr. Defatta testified that the trajectory of Maynor's gunshot wound was certainly possible with the shooter sitting in the backseat.

The defendant did not testify at trial, nor did he present any witnesses or evidence. Through cross-examination, however, defense counsel attempted to show that the defendant shot Evans in self-defense. According to the defendant's third statement, which was played to the jury at trial, Evans pulled a gun from under the driver's seat and pointed the gun toward the defendant. The defendant pushed Evans's arm forward and the gun went off and hit Maynor. Evans then dropped the gun on the floor behind the passenger seat, and the defendant picked up the gun and shot Evans. When Evans reached toward the defendant again, the defendant shot Evans "until he stopped moving." The defendant denied shooting Maynor. After the shooting, the defendant threw the gun in a storm drain in Baton Rouge.

On appeal, the defendant asserts there is no proof that he had any intent to kill or harm Evans because he spent an hour with Evans prior to the shooting. The defendant points out that the gun used in the shooting did not belong to him, which demonstrated his lack of specific intent and corroborated his self-defense claim.

9

Moreover, the defendant argues that the physical evidence established that he shot the gun erratically as he was trying to escape Evans's car. Alternatively, the defendant argues that the verdict of second degree murder should be modified to reflect a judgment of conviction for the lesser included offense of manslaughter. Finally, the defendant contends the State failed to prove he was responsible for Maynor's death.

In finding the defendant guilty of second degree murder, it is clear the jury rejected the defendant's claim of self-defense and concluded that the use of deadly force against Evans under the particular facts of this case was neither reasonable nor necessary. By arming himself with Evans's gun, the defendant escalated the conflict and took on the role of the aggressor. See La. R.S. 14:21; see also **State v. Richardson**, 2015-0746 (La. App. 1st Cir. 11/9/15), 2015 WL 6951573, *4 (unpublished), writ denied, 2015-2262 (La. 2/19/16), 186 So.3d 1178; **State v. Ensminger**, 2012-1614 (La. App. 1st Cir. 4/26/13), 2013 WL 1792653, *6 (unpublished); **State v. Loston**, 2003-0977 (La. App. 1st Cir. 2/23/04), 874 So.2d 197, 205, writ denied, 2004-0792 (La. 9/24/04), 882 So.2d 1167. The defendant's own statement establishes that once he had possession of the gun, he shot an unarmed Evans, at point-blank range. Then, instead of escaping from the alleged threat, the defendant continued to shoot Evans "until he stopped moving." By deliberately pointing and firing a deadly weapon at close range, the defendant exhibited specific intent to kill or inflict great bodily harm. See **State v. Welch**, 2019-0826 (La. App. 1st Cir. 2/21/20), 297 So.3d 23, 27, writ denied, 2020-00554 (La. 9/29/20), 301 So.3d 1193.

Moreover, the defendant's actions in failing to report the shooting and fleeing from the scene, as well as lying and making inconsistent statements, are not consistent with a theory of self-defense. The defendant initially admitted only to meeting with Evans and Maynor, denying any involvement in their deaths.

10

However, in his third statement to police, he stated that after he got into Evans's car, Evans suddenly pulled a gun on him. Despite the defendant's attempt to suggest that the shooting occurred almost immediately after he met with Evans and Maynor, the defendant's phone records revealed that they were together for at least an hour prior to the shooting. All three individuals traveled together from St. Gabriel to Gonzales and then back to St. Gabriel. Cell site location data and surveillance footage confirmed that Evans's vehicle, carrying all three individuals, passed by Wayne's Grocery at 9:32 p.m. When Evans called 911 at 9:35 p.m., all three individuals were still together. The defendant's phone did not begin traveling away from Evans until 9:38 p.m. Thus, the defendant's assertion that he only met with the victims briefly before shooting them is inconsistent with the evidence and testimony presented at trial. Furthermore, the defendant never called 911 or the police, or sought help. Instead, he fled the scene and threw the murder weapon in a storm drain. Flight following an offense reasonably raises the inference of a "guilty mind." **State v. Taylor**, 2014-0432 (La. 3/17/15), 166 So.3d 988, 995 (*per curiam*); **State v. Labee**, 2022-0995 (La. App. 1st Cir. 2/24/23), 361 So.3d 1072, 1078; **Dunn**, 340 So.3d at 87.

Regarding the theory of an accidental shooting with respect to Maynor, the defendant's own statement to police officers, the forensic evidence, and the ballistics analysis contradict an accidental shooting. In his own words during his interview with police, the defendant described how he pushed Evans's arm forward, and the gun fired once and hit Maynor accidentally. However, ballistics expert Richardson noted that the gun was not automatic and would need to be intentionally fired each time. Furthermore, crime scene analyst Downy concluded that there were three shots to the passenger side of the vehicle where Maynor was seated, which is inconsistent with the gun only going off once. Based on the trajectory analysis she conducted, Downy stated that she would not expect a shot into the passenger side to originate

11

from the driver's seat as a result of someone hitting the driver's arm. Moreover, Dr. Defatta testified that the trajectory of the shot that killed Maynor was certainly possible with a shooter sitting in the middle of the backseat, which is where the defendant was seated. Therefore, it is unlikely that the defendant merely pushing Evans's arm could have resulted in Evans accidentally firing the weapon and killing Maynor.

The jury can accept or reject the testimony of any witness. To resolve conflicting testimony relative to factual matters, the jury must make credibility determinations and weigh the evidence. **State v. Eby**, 2017-1456 (La. App. 1st Cir. 4/6/16), 248 So.3d 420, 426, writ denied, 2018-0762 (La. 2/11/19), 263 So.3d 1153. See **Mire**, 269 So.3d at 700-01. The **Jackson** standard of review does not permit a reviewing court to substitute its own appreciation of the evidence for the factfinder's, assess the credibility of witnesses, or reweigh evidence. See **State v. McGhee**, 2015-2140 (La. 6/29/17), 223 So.3d 1136, 1137 (*per curiam*); **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 422 (*per curiam*). Thus, in the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the jury, is sufficient to support a factual conclusion. **State v. Higgins**, 2003-1980 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).

Accordingly, in reviewing the evidence, we cannot say that the jury's determination that the defendant was guilty of the second degree murder of Evans and manslaughter of Maynor was irrational under the facts and circumstances presented to them. See **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **Calloway**, 1 So.3d at 418. To otherwise accept a

12

hypothesis of innocence that was not unreasonably rejected by the factfinder, a court of appeal impinges on a factfinder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law. See **Mire**, 269 So.3d at 703. Thus, the challenges to sufficiency of the evidence are without merit.

## REMOVAL OF JUROR

In his second assignment of error, the defendant argues that his constitutional rights were violated when, over defense objection, the trial court removed a juror who appeared to be sleeping and replaced her with an alternate juror.

Once a jury has been selected and sworn, the accused has a right to have his fate decided by the particular jurors selected to try him. **State v. Cass**, 356 So.2d 396, 397 (La. 1977). The right of the accused to have a juror selected by him try the case is a substantial one, the improper deprivation of which is prejudicial. The doctrine of harmless error is, therefore, inapplicable. **Id.** at 398. After the trial begins and the first witness is sworn, a juror who has been sworn may not be removed unless they are deemed "incompetent to serve." See La. Code Crim. P. art. 796; **Cass**, 356 So.2d at 397. A juror may be found incompetent to serve because of death, illness, or any other cause which renders a juror unfit or disqualified to perform their duty as prescribed. **Cass**, 356 So.2d at 397-98; see **State v. Williams**, 500 So.2d 811, 813-14 (La. App. 1st Cir. 1986). Alternate jurors, in the order in which they are called, shall replace jurors who become unable to perform or disqualified from performing their duties. La. Code Crim. P. art. 789(A). The determination of whether a juror has become unable to perform or disqualified to perform their duty is one made by the trial court in its discretion. **State v. Derouselle**, 99-3283 (La. 4/28/00), 761 So.2d 1269, 1270 (*per curiam*).

A defendant charged with a felony shall be present "[a]t the calling, examination, challenging, impaneling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror." La. Code Crim.

13

P. art. 831(A)(3). Once a juror is qualified as competent to serve and sworn in, the defendant must be present when the juror's competency to serve is challenged or questioned. See **State v. White**, 153 So.2d 401, 408-09 (La. 1963) (conviction vacated where parties disqualified a sworn juror in an *ex parte* hearing, outside the presence of the defendant); **State v. Copeland**, 419 So.2d 899, 905 (La. 1982) (conviction vacated where trial judge disqualified sworn jurors outside the presence of the defendant without a hearing); **State v. Clay**, 441 So.2d 1227, 1230 (La. App. 1st Cir. 1983), writ denied, 446 So.2d 1213 (La. 1984). The defendant's absence during this important event in the course of a trial "has the effect of vitiating the entire proceedings." **White**, 153 So.2d at 408; **Clay**, 441 So.2d at 1230.

Prior to playing the three-hour-long video statement of the defendant, the State expressed concern over a juror, Bernadine Poole, who appeared to have been sleeping during proceedings earlier that morning. The trial judge stated that she noticed Ms. Poole sleeping earlier, so she asked a bailiff to tap Ms. Poole on the shoulder. Ms. Poole "did awaken at that point" and mouthed, "I'm listening, I'm listening." Later that afternoon, while the video continued to play for the jury, the judge and the attorneys held a bench discussion, and the following exchange took place regarding Ms. Poole:

> **THE COURT:** It's 4:42. Ms. Poole is curling up under her blanket and dozing.
>
> **[THE STATE:]** She's been sleeping –
>
> **THE COURT:** She says that every time we touch her she says I'm honestly not sleeping. I don't think she can possibly be listening.
> Can we stop for today?
>
> **[THE STATE:]** Yes, ma'am.

After court adjourned for the day, the trial judge walked out at the same time as Ms. Poole and "took it upon [her]self to address [Ms. Poole] about her eyes being closed[.]" The judge told Ms. Poole that she was concerned about Ms. Poole not

14

being able to stay awake. Ms. Poole told the judge that she was listening and that she hears better with her eyes closed.

On the next day of trial, the State continued playing the video for the jury. The trial judge could not see or hear Ms. Poole that morning because there was a TV blocking her view of the jury. However, others informed the trial judge that Ms. Poole was having "over-exerted respirations out of her mouth that … resembled a mild snore."

At some point, the judge asked the jury to stand up and get their "wiggles" out, specifically trying to wake Ms. Poole up. The judge's staff reported to her that Ms. Poole took a while to rise, seemingly because Ms. Poole didn't hear the judge's instruction for everyone to stand up. The judge stated that someone again told her that Ms. Poole appeared to be sleeping.

Once the video ended, the court recessed, and the trial judge began a sidebar discussion with all counsel specifically to discuss Ms. Poole's alleged sleeping. The State expressed concern over Ms. Poole missing portions of testimony and stated that it had "no alternative especially since the Court is aware of it and has been." The State then moved for Ms. Poole to be stricken from the jury.

Defense counsel objected to removing Ms. Poole, stating that he had not noticed Ms. Poole sleeping. Defense counsel pointed out that Ms. Poole stated it's not uncommon for her to close her eyes while she's listening to something. The trial judge then placed her observations on the record before determining that Ms. Poole was rendered unavailable because she was unable to stay awake. Ms. Poole was brought back into the courtroom outside the presence of the other jurors, and the judge excused Ms. Poole without stating the reason why.[7] Defense counsel objected

---

[7] Before Ms. Poole returned to the courtroom, the trial judge and the State agreed that Ms. Poole should not know why she was excused because "she may start defending it."

15

to the trial court's ruling and noted that Ms. Poole was the only African American juror on the entire panel.

In **Cass**, 356 So.2d at 397, the trial judge noticed that one of the jurors appeared to be asleep as his head was nodding and his eyes were closed. After watching him for two to four minutes, the judge, believing that the juror was ill, summarily ordered the removal of the juror and replaced him with an alternate. Before exiting the courtroom, the juror stated twice that he had not been sleeping. **Id.** On review, the Louisiana Supreme Court found removal of the juror under those circumstances constituted reversible error. **Id.** at 398. In so ruling, the Court stated as follows:

> [A]pplying [La. Code Crim. P. art. 789,] we determine that even if the juror in question did briefly doze off, such is not per se proof of inability to perform, or any character of disqualification. Thus, there would be no legal cause for removing him. Had the juror been shown to have been sleeping through a substantial part of the trial or had he been unable to stay awake despite warnings or efforts to arouse him, and had defendant and the state been afforded an opportunity to explore on the record the defendant's inability to perform on this account, we would be presented with a substantially different question for review.

**Id.**

Further, in **State v. Johnson**, 463 So.2d 620, 626 (La. App. 1st Cir. 1984), remanded on other grounds, 464 So.2d 1363 (La. 1985), the defendant argued that the trial court erred in refusing to excuse two jurors who appeared to be sleeping during the reading of the victim's prior testimony. The trial judge stated he noticed two jurors with their eyes closed but, after watching them closely, did not believe that either of the jurors were asleep. **Id.** As defense counsel did not request an opportunity to make, nor made, any showing that the jurors were actually asleep or unable to perform their duties, this court found no error in the trial court's refusal to remove the jurors. **Id.** at 627.

In **State v. Shurley**, 2014-0850 (La. App. 1st Cir. 6/5/15), 2015 WL 3613186, *5 (unpublished), writ denied, 2015-1246 (La. 6/17/16), 192 So.3d 775, the

defendant requested a juror be removed, or alternatively, moved for a mistrial after a juror was allegedly dozing off for about fifteen seconds during the testimony of the case detective. The trial judge questioned the juror outside the presence of the other jurors, and she admitted to dozing off for a few seconds. **Id.** Based on the length of time that the juror appeared to be sleeping, the trial judge did not believe there was a sufficient reason to remove the juror. **Id.** at *5-6. On appeal, this court found no error in the trial court's decision, noting that the juror's dozing was "a minor, isolated incident, as opposed to a substantial, chronic one." **Id.** at *6.

Likewise, in **State v. Moore**, 2017-1607 (La. App. 1st Cir. 2/6/19), 2019 WL 474712, *4 (unpublished), writ denied, 2019-0376 (La. 5/6/19), 270 So.3d 581, this court found no error in the trial court's decision to not replace a sleeping juror who was allegedly asleep during part of the defendant's closing argument and the reading of the jury instructions, where briefly "dozing off" is not *per se* proof that a juror is unable to perform their duties or that they should be disqualified. **Id.** Moreover, the trial court record was void of any evidence to support the defendant's claim that the particular juror was actually asleep, and the juror was provided an opportunity to have the jury instructions reread to him. **Moore**, 2019 WL 474712 at *4.

After a thorough review of the record, we find that the trial judge did not err by removing the juror in question, Ms. Poole. Unlike the jurors in **Cass, Johnson, Shurley,** and **Moore,** Ms. Poole's alleged sleeping was a substantial and chronic distraction to the trial court, not merely a "minor, isolated incident[.]" See **Shurley,** 2015 WL 3613186 at *5. Ms. Poole was repeatedly observed with her eyes closed on multiple days of the trial during live witness testimony, as well as during the presentation of the defendant's three-hour-long statement. Moreover, Ms. Poole was verbally warned to stay awake by the trial court several times and was tapped on her shoulder to wake up by a bailiff and another juror. She also exhibited "over-exerted respirations" through her mouth, which resembled snoring. Finally, defense counsel

17

did not move for a hearing to question Ms. Poole on the record, and both at trial and on appeal, the defendant failed to object to the fact that Ms. Poole was disqualified outside the presence of the defendant. See **State v. Sterling**, 2013-287 (La. App. 5th Cir. 12/12/13), 131 So.3d 295, 306, writ denied, 2014-0065 (La. 8/25/14), 147 So.3d 698 (no error in trial court's refusal to remove sleeping juror where defendant did not request a hearing to determine whether juror was actually asleep, and the juror was not observed sleeping for an extended period of time or during the taking of evidence); **State v. King**, 2011-767 (La. App. 5th Cir. 2/28/12), 88 So.3d 1147, 1156, writ denied, 2012-0660 (La. 9/14/12), 99 So.3d 35. Accordingly, there was no abuse of discretion in the trial court removing Ms. Poole after she was shown to have been sleeping through a substantial part of the trial and was unable to stay awake despite warnings and efforts to arouse her. Therefore, this assignment of error is without merit.

## CONCLUSION

For the reasons stated above, we affirm the defendant's convictions and sentences.

**CONVICTIONS AND SENTENCES AFFIRMED.**

STATE OF LOUISIANA

VERSUS

JAYLON K. BROWN

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2023 KA 0293

**Holdridge, J., dissenting in part.**

I respectfully dissent from the majority's ruling affirming the trial court's removal of juror Bernadine Poole. Once a jury has been selected and sworn, the accused has a right to have his fate decided by the particular jurors selected to try his case. **State v. Cass**, 356 So.2d 396, 397 (La. 1977). The right of the accused to have a juror selected by him try the case is a substantial one, the improper deprivation of which is prejudicial. The doctrine of harmless error is, therefore, inapplicable. **Cass**, 356 So.2d at 398. Moreover, once a juror is qualified as competent to serve and sworn in, the defendant must be present any time a sworn juror's competency to serve is challenged or questioned, or else the entire proceeding is "vitiat[ed.]" La. C.Cr.P. art. 831(A)(3); **State v. White**, 153 So.2d 401, 408-09 (La. 1963); **State v. Clay**, 441 So.2d 1227, 1230 (La. App. 1 Cir. 1983), writ denied, 446 So.2d 1213 (La. 1984).

In **Cass**, 356 So.2d at 397, the trial judge noticed that one of the jurors appeared to be asleep as his head was nodding and his eyes were closed. After watching him for two to four minutes, the judge, believing that the juror was ill, summarily ordered the removal of the juror and replaced him with an alternate. **Cass**, 356 So.2d at 397. Before exiting the courtroom, the juror stated twice that he had not been sleeping. **Cass**, 356 So.2d at 397. On review, the Louisiana Supreme Court found removal of the juror under those circumstances constituted reversible error. **Cass**, 356 So.2d at 398. In so ruling, the Court stated as follows:

> [A]pplying [La. C.Cr.P. art. 789,] we determine that even if the juror in question did briefly doze off, such is not per se proof of inability to perform, or any character of disqualification. Thus, there would be no

legal cause for removing him. Had the juror been shown to have been sleeping through a substantial part of the trial or had he been unable to stay awake despite warnings or efforts to arouse him, and had defendant and the state been afforded an opportunity to explore on the record the defendant's inability to perform on this account, we would be presented with a substantially different question for review.

**Cass**, 356 So.2d at 398.

In the instant case, the trial court ruled, during a bench discussion with counsel and outside the presence of the defendant, that Ms. Poole's alleged sleeping rendered her unavailable. While the State and the trial judge observed Ms. Poole to be sleeping, Ms. Poole stated several times that she was listening and that she listened better with her eyes closed. Ms. Poole never admitted that she was sleeping, much less on the record where the parties could question her. Even if Ms. Poole was dozing off, there is no evidence in the record to support the allegation that Ms. Poole was sleeping through a substantial part of the trial or that she was unable to stay awake despite efforts to arouse her. The trial judge stated that every time they tried to wake Ms. Poole, she immediately awoke and said she was listening. Furthermore, the trial judge only personally observed Ms. Poole sleeping on one occasion on the second day of trial. On the third day of trial when Ms. Poole was removed, the trial judge repeatedly said that it was "reported" to her that Ms. Poole was allegedly sleeping or appeared to be sleeping. Thus, the trial judge did not personally observe Ms. Poole sleeping through a substantial part of the trial.

Moreover, the trial court removed Ms. Poole outside the presence of the defendant and without conducting an evidentiary hearing. Challenging Ms. Poole's competency to serve and thereafter disqualifying her, outside the presence of the defendant, is contrary to the well-settled rule that a defendant must be present during every stage of the trial, including when a sworn juror is disqualified to serve. See La. C.Cr.P. art. 831(A)(3); **Copeland**, 419 So.2d 899, 905 (La. 1982); **White**, 153 So.2d at 408-09. Furthermore, although Ms. Poole was present and available for

2

questioning on the record, the trial court failed to allow the defendant to examine Ms. Poole. Instead, she was summarily disqualified during a bench conference, outside the presence of the defendant, and with the State's express concern that doing otherwise might allow Ms. Poole the opportunity to defend her ability to serve. Cf. **State v. Bringier**, 2021-0476 (La. App. 1 Cir. 12/30/21), 340 So.3d 975, 982, writ denied, 2022-00157 (La. 4/5/22), 335 So.3d 837 (no error in discharging unavailable juror who failed to show up for second day of trial and could not be found or contacted by telephone); **State v. Williams**, 500 So.2d 811, 814 (La. App. 1 Cir. 1986) (no error in discharging late juror who was unavailable for questioning); **Clay**, 441 So.2d at 1231 (no error in discharging unavailable juror who was unable to attend trial because of a family problem).

Finally, we have no record to review as to whether Ms. Poole was actually sleeping. Ms. Poole herself repeatedly denied that she was asleep, and the only allegations supporting disqualification are off-the-record observations that Ms. Poole appeared to be sleeping. By not having an evidentiary hearing, the trial court denied the parties the opportunity to question Ms. Poole on the record regarding her competency to serve and deprive this court of an opportunity to review the evidence. See **State v. Burns**, 35,267 (La. App. 2 Cir. 10/31/01), 800 So.2d 106, 108 (conviction reversed where alleged sleeping juror was summarily discharged during off-the-record discussion); cf. **State v. Traylor**, 51,901 (La. App. 2 Cir. 2/28/18), 246 So.3d 665, 671, writ denied, 2018-0493 (La. 2/11/19), 263 So.3d 893 (no abuse of discretion in removing sworn juror, where trial court held a hearing before removing juror); **State v. Preston**, 2015-306 (La. App. 5 Cir. 10/28/15), 178 So.3d 207, 218, writ denied, 2015-2169 (La. 11/18/16), 210 So.3d 283 (no abuse of discretion in refusing to remove sworn jurors after the parties were allowed to explore on the record whether jurors were sleeping).

3

The majority argues that in this case, unlike in the **Moore, Shurley**, and **Johnson** cases, Ms. Poole's alleged sleeping was a substantial and chronic distraction to the trial court, rather than a minor, isolated incident. **State v. Moore**, 2017-1607 (La. App. 1 Cir. 2/6/19), 2019 WL 474712, *3-4 (unpublished), <u>writ denied</u>, 2019-0376 (La. 5/6/19), 270 So.3d 581; **State v. Shurley**, 2014-0850 (La. App. 1 Cir. 6/5/15), 2015 WL 3613186, *5-6 (unpublished), <u>writ denied</u>, 2015-1246 (La. 6/17/16), 192 So.3d 775; **State v. Johnson**, 463 So.2d 620, 626-27 (La. App. 1 Cir. 1984), <u>remanded on other grounds</u>, 464 So.2d 1363 (La. 1985). However, this comparison fails to account for the fundamental difference between these cases. In **Moore, Shurley**, and **Johnson**, the defendant argued that the trial court erred in overruling his objection by refusing to replace an allegedly sleeping juror. **Moore**, 2019 WL 474712 at *3; **Shurley**, 2015 WL 3613186 at *5; **Johnson**, 463 So.2d at 626. Here, the trial court removed Ms. Poole absent any objection from the defendant, and, concerningly, outside the presence of the defendant and without first conducting an evidentiary hearing. There is an essential difference between declining to remove a juror who the defendant has already accepted, and unilaterally removing a juror who has already been qualified and accepted to serve.

The defendant had a right to have his fate decided by the particular jurors selected to try him, including Ms. Poole. Therefore, the trial court summarily removing Ms. Poole and stating that she was unfit to continue her service as a juror, absent sworn testimony and outside the presence of the defendant, constituted an abrogation of the defendant's fundamental right to a fair trial. For these reasons, I respectfully dissent from that part of the majority opinion finding no error in the juror's removal, and I agree with that part of the majority opinion finding the evidence sufficient to support the defendant's conviction.